**UNITED STATES of America, Plaintiff,**

**Daily News, L.P.; Greg Smith; NYP Holdings, Inc.; Al Guart; The New York Times Company, Inc. and Newsday, Inc., Intervenors–Appellants,**

v.

**Don KING and Don King Productions, Inc., Defendants–Appellees.**

**Docket No. 98–1072.**

United States Court of Appeals, Second Circuit.

Argued March 5, 1998.

Decided March 12, 1998.

---

Slade R. Metcalf, New York City (Melissa Georges, Squadron, Ellenoff, Plesent & Sheinfeld, New York City; Eve Burton, Daily News, New York City; Adam Liptak, The New York Times Company, New York City; Carolyn Schurr, Newsday, Inc., Melville, NY, on the brief), for intervenors-appellants.

Christine H. Chung, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., Laura Grossfield Birger, Baruch Weiss, Asst. U.S. Attys., New York City, on the brief), for the U.S.A.

Peter E. Fleming, New York City (Benard V. Preziosi, Jr., Curtis, Mallet–Prevost, Colt & Mosle, New York City, on the brief), for defendant Don King.

William H. Murphy, Jr., Baltimore, PA., for defendant Don King Productions, Inc.

Before: OAKES, NEWMAN, and CABRANES, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This interlocutory appeal concerns a limited closure of proceedings in a criminal trial,

primarily a denial of press access to transcripts of *in camera* individual *voir dire* of prospective jurors until a jury has been impaneled. Intervenors—the companies publishing *The Daily News, The New York Post, The New York Times,* and *Newsday,* and a *Daily News* and a *Post* reporter—appeal from orders entered on December 27, 1995, and February 5, 1998, by the District Court for the Southern District of New York (Lawrence M. McKenna, *Judge* ), in connection with jury selection in the impending trial of boxing promoter Don King and his corporation on wire fraud charges, scheduled to begin March 12, 1998. The orders also limit press access to transcripts of *voir dire* proceedings from King's 1995 trial on the same charges, which ended in a mistrial. We affirm.

## Background

King was originally the sole defendant on an indictment charging him with wire fraud offenses arising out of an alleged scheme to defraud an insurance company. Jury selection for King's trial on those charges commenced in September 1995. *Voir dire* was conducted in the jury room, one prospective juror at a time, with only the District Judge and counsel present. No member of the press sought to be present at *voir dire,* and the transcripts of these proceedings were sealed, without any contemporaneous press objection. The trial ended on November 17, 1995, when the jury deadlocked and the District Court declared a mistrial.

On November 27, 1995, some of the current intervenors applied for an order unsealing transcripts of (i) the *voir dire* questioning of prospective jurors, (ii) the parties' exercise of peremptory challenges, and (iii) robing room and sidebar conferences at which evidentiary issues were discussed and ruled on in the course of the first trial. The District Court issued its ruling on the motion on December 27, 1995. *See United States v. King,* 911 F.Supp. 113 (S.D.N.Y.1995). With respect to the *voir dire* transcripts, the District Court denied the application, concluding that

there is a substantial probability that the release at this time of transcripts of the *voir dire* of prospective jurors for the first trial will reduce the candor of prospective jurors during *voir dire* for the second trial, and that such a reduction of candor on the part of prospective jurors will affect the fairness of the second trial in that the ability of the Court and counsel to uncover attitudes of prospective jurors which would be the basis for challenges will be impeded. *Id.* at 118. With respect to the peremptory challenge transcripts, the Court ordered the Government and King to submit copies of the sealed transcripts together with any suggestions for redactions, and announced that the transcripts (redacted to the extent necessary) would be released "as soon as possible." *Id.* With respect to the transcripts of sidebar and robing room discussions on evidentiary issues, the Court requested similar submissions from the parties. The Court ruled that those transcripts would be released promptly to the extent they did not "have a substantial probability of jeopardizing the fairness of a second trial," *id.* at 120, and that the balance of the transcripts would be released at an "appropriate" time thereafter, *see id.*

The movants filed a notice of appeal from this decision on January 12, 1996. However, the parties agreed by stipulation that, because the District Court's order was not final with respect to two of the three categories of sealed transcripts affected by the ruling, the appeal would be withdrawn without prejudice to reinstatement within 30 days of the District Court's decision with respect to the release of the peremptory challenge and evidentiary issue transcripts.

The District Court issued no further ruling on the matter in the following two years. Counsel for *The Daily News* has represented that Smith called Judge McKenna's chambers "on numerous occasions" during this time to "inquire" about the status of the motion, *see* Reply Brief for Intervenors–Appellants at 19 n.13, but the press made no application for relief to either the District Court or this Court concerning the delay nor sought for two years to perfect an appeal from the portion of the ruling that concerned the *voir dire* transcript.

Meanwhile, the Government sought and obtained a superseding indictment charging

both King and his wholly owned corporation, Don King Productions, Inc. ("DKP"), with the wire fraud offenses.[1] On October 6, 1997, King and DKP moved to close the *voir dire* of prospective jurors for the retrial. The District Court commendably ordered the motion served on press representatives and notice of the motion published in *The New York Law Journal*. The intervenors and the Government opposed the motion. While that motion was *sub judice*, the District Court issued an order releasing redacted transcripts reflecting the exercise of peremptory challenges in connection with the first trial and subsequently issued an order releasing redacted transcripts of the side bar and robing room conferences from that trial. *See United States v. King*, No. 94 Cr. 455, 1998 WL 67679 (S.D.N.Y. Feb. 18, 1998). The intervenors have not appealed these rulings.

On February 5, 1998, between the two rulings that released previously sealed materials from the 1995 trial, the District Court issued a ruling limiting press access to the jury *voir dire* proceedings in the impending second trial and implicitly maintained the sealing of the jury *voir dire* proceedings from the first trial. *See United States v. King*, No. 94 Cr. 455, 1998 WL 50221 (S.D.N.Y. Feb. 5, 1998) (*"King voir dire II "*). Since this appeal ultimately turns on whether Judge McKenna's ruling contains supported findings that sufficiently justify the limitations on press access that he has imposed, we set forth the principal elements of his analysis.

The District Court made several findings. The ultimate findings, reconfirming what the Judge had concluded immediately after the first trial and in anticipation of a retrial, were (1) "that candor on the part of prospective jurors is of particularly great importance in this case," and (2) "that, absent a degree of juror privacy, such candor is likely to be restricted." *Id.* at *2. Explaining the second point, Judge McKenna wrote, "Prospective jurors, if made aware that their views will be publicly disseminated in the next day's newspapers or radio or television broadcasts, will be under pressure not to express unpopular opinions relevant to their choice as trial jurors." *Id.*

The basis for the Judge's apprehension that the candor of prospective jurors would likely be inhibited was supported by several subsidiary findings. First, he noted that King is "an extremely controversial person," *id.* at *6, a fact abundantly supported by the record. Second, he found that King has been "the subject of a very substantial amount of publicity, a large proportion of which is negative . . . ." *Id.* This finding too is abundantly supported by the record. Two examples convey the unfortunate type of press excess that prompted the District Court's concern. First, *The New York Post*, reporting that King's first trial had ended inconclusively because the jurors were deadlocked, used the headline, "Move over John Gotti, there's a new 'Teflon Don,' " comparing King to the convicted head of a major crime family who had won earlier acquittals. *New York Post* (Nov. 18, 1995). Second, when the transcripts of the peremptory challenge proceedings from the first trial were recently released, *The Daily News*, reporting that King's defense counsel had made a traditional *Batson* challenge to what it alleged was the Government's pattern of striking Black jurors, used the inflammatory headline "Don King used race card, data show." *Daily News* (Feb. 1, 1998).[2]

The Court then found, based on its experience from the first trial jury *voir dire*, that

---

**1.** Inclusion of DKP in the new indictment was initially precluded by the District Court on the ground of prosecutorial vindictiveness. *See United States v. King*, No. 94 Cr. 455, 1997 WL 527867 (S.D.N.Y. Aug. 22, 1997). On an interlocutory appeal by the Government, we reversed. *See United States v. King*, 126 F.3d 394 (2d Cir. 1997).

The District Court subsequently issued an opinion granting both defendants' motions to bar the use of King's testimony from the first trial in the Government's direct case at the second trial, based on Confrontation Clause concerns. *See United States v. King*, No. 94 Cr. 455, 1997 WL 666778 (S.D.N.Y. Oct. 24, 1997). On a second interlocutory appeal by the Government, we again reversed. *See United States v. King*, 134 F.3d 1173 (2d Cir.1998).

**2.** At least one of the defendant's *Batson* challenges was upheld and the juror challenged by the Government was seated.

"a number of prospective jurors for the forthcoming trial will have strong views about King." *King voir dire II* at *6. The Court additionally found that "[t]he problem created by publicity has been exacerbated by the recent (November 1997) HBO drama about King, which portrays him in a very negative way." *Id.* The publicity for the HBO program suggests that King might be a "Villain" or a "Devil." The HBO program has aired repeatedly since its initial telecast, as recently as February 18, 1998.

Then, amplifying his initial point concerning juror candor, Judge McKenna stated that "full and frank answers are of particular importance in the present case because of the widespread publicity" concerning King, and that "[k]nowledge on the part of prospective jurors that their answers on *voir dire* will be reported in the press 'may so inhibit or chill truthful responses that [the] accused is denied the fair trial to which he is entitled.'" *Id.* (quoting *In re South Carolina Press Ass'n*, 946 F.2d 1037, 1043 (4th Cir. 1991)).

Finally, Judge McKenna noted that the usual instruction to members of the venire not to read press reports of the trial, including jury selection, cannot be relied on to avoid inhibiting candor because the jurors might be told of press accounts of their responses by others, before they could prevent such communication, and because the jurors would fear the adverse reaction of friends, employers, or others who might disapprove of the jurors' candid views.

Ultimately concluding that, without some limited closure, there existed "'persuasive evidence of serious risk [a] to an important interest,'" *id.* at *7 (quoting *Ayala v. Speckard*, 131 F.3d 62, 70 (2d Cir.1997) (in banc)), *i.e.*, "substantial risk of seriously lessening juror candor in *voir dire*," *id.* at *7, and [b] "to the impartiality of the jury," The District Court ordered the following procedure:

1. Prospective jurors will fill out an extensive questionnaire, inquiring about personal background information, knowledge of the parties, counsel, and persons likely to be mentioned during the trial, extent of awareness of publicity about the case and the defendants, and attitudes toward King and the Government. Nothing in the Court's ruling limits press access to the uncompleted questionnaire form.

2. Filled out questionnaires will be available only to the Court and the parties until the jury has been impaneled.

3. Individual follow-up questioning of prospective jurors will be conducted out of the presence of the public and the press.

4. During individual follow-up questioning, each juror will be given the opportunity to indicate whether the juror's responses might warrant protection because they "'touch[ ] on deeply personal matters that person has legitimate reasons for keeping out of the public domain.'" *Id.* at *5 (quoting *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 511, 104 S.Ct. 819, 824–25, 78 L.Ed.2d 629 (1984)). The Court will consider such a request and, if the request is granted, determine whether the appropriate remedy will be to redact the response, redact the juror's name, or seal the transcript of the response.

5. Subject to any limitation ordered pursuant to step 4, the completed juror questionnaires and the transcript of follow-up questioning will be disclosed when the jury has been impaneled.

All the Intervenors have appealed the February 5, 1998, ruling outlining limitations on disclosure of jury *voir dire* questioning in connection with the forthcoming trial, and some of them have appealed the December 27, 1995 ruling, to the extent that it denied release of the jury *voir dire* questioning from the 1995 trial.

## Discussion

### I. Applicable Standard

The standards generally applicable to the validity of limitations on public and press access to criminal court proceedings have been authoritatively set forth in *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), and more particularly stated as to limitations on access to jury *voir dire* proceedings in *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 511, 104 S.Ct. 819, 824–25, 78 L.Ed.2d 629 (1984) ("*Press–*

*Enterprise I* "). As formulated in *Waller,* limitation on public access requires that (1) the party seeking the limitation must advance an overriding interest that is likely to be prejudiced, (2) the limitation is no broader than necessary, (3) the trial court must consider reasonable alternatives, and (4) the court must make findings adequate to support the limitation. *See Waller,* 467 U.S. at 48, 104 S.Ct. at 2216–17.

Just four months prior to *Waller,* the Supreme Court in *Press–Enterprise I* had explicitly applied its evolving courtroom closure jurisprudence to limitations on public access to jury *voir dire* questioning. The Court recognized that "[n]o right ranks higher than the right of the accused to a fair trial," *Press–Enterprise I,* 464 U.S. at 508, 104 S.Ct. at 823, but also pointed out that "the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the *voir dire* which promotes fairness," *id.*

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to serve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Id.* at 510, 104 S.Ct. at 824.

The limitation on access to *voir dire* questioning was rejected for three reasons. First, the trial judge had made no findings to support the asserted interests in assuring the accused a fair trial and protecting the privacy of the jurors. *See id.* at 510–11, 513, 104 S.Ct. at 824, 825–26. Second, the trial judge had not considered alternatives to the limitation imposed. *See id.* at 513, 104 S.Ct. at 825–26. Third, the *voir dire* transcripts had been permanently sealed. *See id.*

The Court gave particular attention to steps that a trial judge should take to protect the juror's interest in maintaining the privacy of highly personal or embarrassing matters that might be elicited in *voir dire* questioning. *See id.* at 511–12, 104 S.Ct. at 824–25. When that interest is asserted, the trial judge should inform jurors of their opportu-

nity to request presentation of their concerns *in camera,* at which time the judge may determine either to excuse the juror, or to seal the *in camera* responses for "a reasonable time," *id.* at 512, 104 S.Ct. at 825, or to withhold either part of the transcript or the name of the juror.

In the pending appeal, the intervening appellants contend that the procedures outlined in *Press–Enterprise I* for responding to juror concerns about personal embarrassment apply to limitations on access to *voir dire* questioning in all circumstances, and they seek reversal because Judge McKenna's limitation procedures do not precisely track the *Press–Enterprise I* formulation. We think the appellants read *Press–Enterprise I* too narrowly. The Court there outlined one course for a trial judge to follow when confronted with one problem—the risk of juror embarrassment about disclosing highly personal matters. The Court had no occasion to discuss the problem that confronted Judge McKenna—how to protect the accused's right to a fair trial by avoiding inhibitions upon jurors' candor in order to assure that a fair and impartial jury will be selected. Though the Court recited in its statement of facts that the prosecutor had argued that "if the press were present, juror responses would lack the candor necessary to assure a fair trial," *id.* at 503, 104 S.Ct. at 820, its discussion of the legal standards and the competing interests to be considered is notably devoid of any mention of the threat to juror candor. To whatever extent the Court's general reference to Sixth Amendment interests impliedly acknowledged some concern about juror candor, the limitation on access to *voir dire* questioning was rejected not because this concern was deemed insubstantial but because of the trial judge's failure to make findings, failure to consider alternatives, and failure to adopt a narrowly tailored limitation.

Other courts have considered the issue of limiting public access to jury *voir dire* questioning and have reached varying results, explainable primarily by the particular circumstances each court encountered. In *Cable News Network, Inc. v. United States,* 824 F.2d 1046 (D.C.Cir.1987), a limitation, pur-

portedly entered solely to protect jurors' privacy interests, was set aside for lack of findings, lack of consideration of alternatives, and failure to follow the procedure outlined in *Press–Enterprise I* for responding to juror concerns about privacy. *See id.* at 1048–49. In *In re Memphis Publishing Co.,* 887 F.2d 646, 648 (6th Cir.1989), and *United States v. Peters,* 754 F.2d 753, 761 (7th Cir.1985), limitations were deemed inadequately justified by any findings. In *In re Dallas Morning News Co.,* 916 F.2d 205, 206 (5th Cir.1990), the Court, though denying mandamus relief, outlined a course for the District Court to follow, including permitting jurors to be interviewed *in camera* and there asked whether they had legitimate reasons for having sensitive matters pursued behind closed doors. In *In re South Carolina Press Ass'n,* 946 F.2d 1037, 1043–44 (4th Cir.1991), exclusion of the public and press from jury *voir dire* questioning was upheld in view of the trial judge's well-supported findings and the extensive, hostile publicity concerning the defendants. The limitation upheld in *South Carolina Press* was more extensive than Judge McKenna's ruling in that the jury questionnaires were to be destroyed at the conclusion of the case. *See id.* at 1041.

As these decisions demonstrate, the application of the standards of *Press–Enterprise I* depends on the precise circumstances confronting the trial judge and the extent to which the judge makes supportable findings, considers alternatives, and frames a limited form of relief.

## II. Application of Standards to the 1998 Ruling

■ Judge McKenna's 1998 ruling suffers from none of the defects that warranted reversal in *Press–Enterprise I.* He made explicit findings to support the limitations he imposed. He selected these limitations only after considering various alternatives, rejecting both more extensive steps suggested by the defendants as too burdensome upon a right of public access and less extensive steps suggested by the press as inadequate to protect the defendants' right to a fair trial. In particular, he considered the Intervenors' suggestion that juror anonymity be maintained by assigning them numbers during *voir dire* and redacting their names from their completed questionnaires. He rejected this alternative both because of the chilling effect upon juror candor of having press representatives in attendance during questioning and "because, even more importantly, indicia of anonymity might well convey a sense of danger entirely inappropriate to the present case." *King voir dire II* at *7. Finally, he imposed his limitations only for the brief duration of time necessary to impanel the jury, except for any particular jury responses that warranted additional sealing, as contemplated by *Press–Enterprise I.*

■ Appellants contend that Judge McKenna was required by *Press–Enterprise I* to ascertain from each juror, in open court, whether that juror wished to be heard *in camera* to assert privacy concerns as to sensitive matters. We disagree. Judge McKenna was concerned not merely with protecting the privacy of the jurors from public disclosure of sensitive, personal matters but also with assuring their candor in responding to questions so that a fair trial would be assured. In light of the widespread and largely negative publicity concerning King and the racial tensions heightened by some aspects of that publicity, he was entitled to conduct individual juror questioning in the absence of the press. It is one thing to oblige jurors to state in public that they prefer a closed door session to identify sensitive matters elicited by a questionnaire. It is quite a different matter to expect them to acknowledge in public that their own candor will be inhibited by questioning in public. *See South Carolina Press,* 946 F.2d at 1043 (acknowledging inhibition on juror candor); *United States v. Colabella,* 448 F.2d 1299, 1304 (2d Cir.1971) (same); *United States v. Hearst,* 412 F.Supp. 873, 875–76 (N.D.Cal.1976) (same); Kimba M. Wood, *Reexamining the Access Doctrine,* 69 S. Cal. L.Rev. 1105, 1119–20 (1996) (same).

■ We do not mean to suggest that public access to jury *voir dire* questioning may be routinely or even occasionally limited by the mere possibility that public questioning might inhibit the candor of the *voir dire* responses. Though press reporting of *voir*

*dire* responses is a rare event,[3] the opportunity of the public and the press to attend criminal proceedings normally makes some contribution to the fairness of trials and the perception that justice is done. *See Press–Enterprise I*, 464 U.S. at 508–10, 104 S.Ct. at 823–24. *Voir dire* access limitations are properly invoked only where circumstances demonstrate their need, and, even then, any limitation must be narrowly drawn and supported by findings, after alternatives have been considered. But this is that unusual case where the fairness of a trial, or at least the *voir dire* phase, that is usually promoted by public access is seriously at risk of being impaired unless some modest limitation on access is imposed. As Judge McKenna observed:

> [I]f a particular prospective juror ... believes that he or she cannot be fully candid on the subject of racial bias if his or her answer is to be publicly disseminated ..., then surely the public interest in a trial not affected by racial bias will be fostered, in the case of that particular juror, if he or she can express racial views or feelings candidly.

*King voir dire II* at *5.

In the pending case, we have considered one variation on Judge McKenna's procedure that might well have been used. Since the concern about juror inhibition on candor, as well as juror privacy, was not implicated by several of the routine background inquiries in the questionnaire, the responses to those matters could have been made public, with only the balance of the responses sealed until impaneling of the jury. However, the press intervenors did not seek that remedy, and displayed no interest in it when it was suggested by this Court during oral argument. In these circumstances, we see no need to adopt such a modification at this time.[4]

We have also considered the alternative, urged by the Intervenors, under which jurors' questionnaires would be released with their names redacted and transcripts of *voir dire* responses would be released each day with juror anonymity maintained. In addition to Judge McKenna's reasons for rejecting this alternative, which we have noted, we point out a further basis for concern. Prospective jurors hearing from friends and neighbors about racially charged views of other jurors as reported by press and TV, often dramatically and without necessary details, will often not read for themselves that names were redacted (even if the news report mentions that fact) nor recall all the details of the trial judge's first-day explanation of the jury selection procedure. The risk, deemed unacceptable by Judge McKenna, is that in this particular case of a defendant of unusually high visibility, already subject to extraordinarily hostile publicity, the airing of jurors' responses will significantly inhibit the candor necessary to assure a fairly selected jury and therefore a fair trial.

Of course, neither the District Judge nor we can be certain that, without his restrained ruling, jury selection will be seriously impaired. But this is a matter on which certainty can never be achieved, and some estimation of likely effects is unavoidable. We do not believe that, on the especially aggravated facts of this case, the District Court was required to conclude that juror anonymity would adequately guard against the risk that prospective jurors would significantly shade their responses after being exposed, directly or indirectly, to press accounts of what other jurors were reported to have said.

### III. Application of Standards to the 1995 Ruling

The only portion of Judge McKenna's 1995 ruling remaining in force that is challenged on this appeal is the limitation on disclosure of the jury *voir dire* questioning from the first trial. If we were considering

---

3. The Seventh Circuit has suggested that "a voir dire interrogation of prospective jurors has about the same attention-grabbing excitement as a report on the annual rainfall in northern Tibet." *See Peters*, 754 F.2d at 762.

4. "Whether or not a *sua sponte* obligation exists to consider alternatives to complete closure, we see nothing in the First Amendment cases or in *Waller* to indicate that once a trial judge has determined that limited closure is warranted as an alternative to complete closure, the judge must *sua sponte* consider further alternatives to the alternative deemed appropriate." *Ayala*, 131 F.3d at 71.

denial of access to the transcript of that questioning shortly after the first trial and well in advance of any retrial, we would face a context significantly different from the one that is now before us. The delay in presenting the issue to us is largely attributable to the appellants. They did not object to limitations on access to jury *voir dire* at the first trial, and, after their post-trial request for release of *voir dire* transcripts was denied (in anticipation of a prompt retrial), they let two years pass before pressing their appeal before this Court. Now, on the eve of the retrial, we agree with Judge McKenna's implicit decision to leave the 1995 limitation in force a few additional days until selection of the second jury. Any release of juror questioning as the second jury is being impaneled risks the same inhibition of juror candor that would result from press reports of the responses of the prospective jurors at the retrial. Prospective jurors reading or learning from others of reports of how other jurors responded to *voir dire* questions in the *King* case are unlikely to distinguish between the first and second trials, even if we assume that the press accounts meticulously make the distinction.

## Conclusion

Recognizing the difficult task trial judges have in reconciling the competing interests of defendants in obtaining a fair trial and of the public and the press in maintaining access to criminal trials, we recently distilled from the relevant Supreme Court authorities the following general guidance:

> the sensible course is for the trial judge to recognize that open trials are strongly favored, to require persuasive evidence of serious risk to an important interest in ordering any closure, and to realize that the more extensive is the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest.

*Ayala,* 131 F.3d at 70. In this case, a conscientious trial judge has diligently applied the relevant authorities, carefully considered the highly unusual circumstances facing him, and crafted a sensible and restrained procedure. The orders appealed from are affirmed.

JOSÉ A. CABRANES, Circuit Judge, dissenting:

I respectfully dissent.

The United States Supreme Court held in *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*), that *voir dire* proceedings are presumptively open to the public and the press. This presumption "may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 510, 104 S.Ct. at 824. Heeding this instruction, we have emphasized that the power to close a courtroom and to seal the transcript of criminal proceedings "is one to be very seldom exercised, and even then only with the greatest caution, under urgent circumstances, and for very clear and apparent reasons." *United States v. Cojab,* 996 F.2d 1404, 1405 (2d Cir.1993) (upholding closure of pre-trial hearing where safety of defendant was said to be at risk). We recently reiterated that "the sensible course is for the trial judge to recognize that open trials are strongly favored, [and] to require persuasive evidence of serious risk to an important interest in ordering any closure...." *Ayala v. Speckard,* 131 F.3d 62, 70 (2d Cir.1997) (in banc). In my view, the district court's orders barring public access to *voir dire* and withholding the transcripts of *voir dire* until after the jury is impaneled are neither justified by the circumstances of this case nor narrowly tailored to avoid trenching upon the public's First Amendment interest in an open trial.

The majority relies upon the district court's findings of fact that the defendant is "an extremely controversial person" who has been "the subject of a very substantial amount of publicity, a large proportion of which is negative." *United States v. Don King,* No. 94 Cr. 455, 1998 WL 50221, at *6 (S.D.N.Y. Feb. 5, 1998). These findings hardly distinguish this case from many high-profile cases tried in federal district courts across this country every year. Were mere notoriety to be deemed a sufficient basis for courtroom closure, the broad presumption of openness established by the Supreme Court

in *Press Enterprise I* would soon lose all force. Indeed, it is precisely in those cases · involving controversial or notorious defendants that the public—and its media proxies—are likely to take an interest in criminal proceedings. It would be perverse to enshrine a constitutional right of public access to criminal proceedings, and then to enforce that right only in cases in which the public has no interest.

The majority attempts to distinguish *Press–Enterprise I,* and therefore to escape its strong presumption of openness, on the basis that "[t]he [Supreme] Court [in *Press Enterprise I* ] had no occasion to discuss the problem that confronted Judge McKenna—how to protect the accused's right to a fair trial by avoiding inhibitions upon jurors' candor in order to assure that a fair trial and impartial jury will be selected." *Ante,* at 81. In fact, the Court in *Press–Enterprise I* expressly observed that the Government had opposed opening *voir dire* in that case because "if the press were present, *juror responses would lack the candor necessary to assure a fair trial,*" and that "[t]he trial judge agreed." 464 U.S. at 503, 104 S.Ct. at 820 (emphasis supplied). Notwithstanding the alleged threat to juror candor relied upon by the trial court, the Supreme Court held that *voir dire* should be open to the public, although it recognized an exception where questioning of the veniremen "touches on deeply personal matters." *Id.* at 511, 104 S.Ct. at 825.[1]

Whether or not there may be circumstances in which a threat to juror candor could justify courtroom closure during *voir dire,* I do not believe that the record adequately supports the district court's determination that there exists in this case a "substantial risk of seriously lessening juror candor in *voir dire,*" 1998 WL 50221, at *7, on a scale that would justify barring public scrutiny of the proceedings.[2] While the record reflects evidence of negative publicity concerning the defendant, negative publicity concerning a well-known criminal defendant is not unusual. I see little basis for concluding, as the majority does, that the threat to juror candor in this case is "especially aggravated," *ante,* at 84.

Even assuming *arguendo* that the circumstances presented in this case met what we have described as the "rigorous standards" for courtroom closure, *Ayala,* 131 F.3d at 69, the district court rejected alternatives to complete closure that would have been more narrowly tailored and less restrictive of First Amendment interests. These included releasing daily transcripts of *voir dire,* while redacting the names of the individual jurors and any other identifying information. The redaction of daily transcripts would address any serious threat to juror candor that may exist in this case. The district court rejected this alternative on the grounds that juror anonymity during *voir dire* "might well convey a sense of danger entirely inappropriate to the present case," 1998 WL 50221, at *7, an argument that the majority apparently finds persuasive, *ante,* at 83. However, there is no reason why the district court could not instruct the veniremen, regularly and repeatedly, that the purpose for keeping their answers to questions during *voir dire* anonymous is to ensure their privacy and to prevent any potential public embarrassment caused by their answers, not to protect them from possible future harm. This is not a murder trial or an organized crime trial. This is a trial for filing a false insurance claim, and the risk that jurors will feel themselves in danger is therefore greatly attenu-

---

1. To the extent that the district court's orders presume that any questions asked of potential jurors regarding their racial attitudes and prejudices necessarily fall within this exception for "deeply personal matters," I believe that this represents an overly expansive construction of that exception. Any such general exception for questions relating to race would permit the strategic use of race, in a broad range of cases, as a means of circumventing the Supreme Court's command that criminal proceedings be presumptively open to public scrutiny.

2. As the Court of Appeals for the Third Circuit has held, because of the First Amendment ramifications of a district court's closure order, we may in fact "engage in an independent factual review of the full record." *United States v. Antar,* 38 F.3d 1348, 1357 & n. 8 (3d Cir.1994) (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964) and *Bose Corp. v. Consumers Union,* 466 U.S. 485, 498–502, 104 S.Ct. 1949, 1958–60, 80 L.Ed.2d 502 (1984)).

ated. Finally, the majority's speculation that veniremen will mistakenly believe that their names are being publicly reported upon hearing "from friends and neighbors about racially charged views of other jurors as reported by press and TV," *ante,* at 83, would, in my view, be more than adequately addressed by regular reminders and assurances from the court that their responses during *voir dire* will not be attributed to them by name.

There is, to be sure, often a tension between the First Amendment interest in open criminal proceedings and the criminal defendant's right to a fair trial. But in general openness acts to ensure, rather than to hinder, the right to a fair trial—in the courtroom, as in other settings, the spotlight of public scrutiny is the surest safeguard of our freedoms. Where, as here, such tension does exist, the rule prescribed by the Supreme Court is that criminal proceedings must remain open to public scrutiny unless the threat to a fair trial is weighty and clear. I do not find the threat identified by the district court to be sufficiently weighty, or clear, to justify limiting public access to *voir dire.*

In sum, because the high-profile nature of this criminal prosecution and the negative publicity that preceded it cannot justify the district court's infringement of First Amendment interests, particularly where less restrictive measures were readily available, I dissent.