ELIZABETH A. WOLFORD, United States District Judge
INTRODUCTION
Defendants David Pirk ("Pirk"), Andre Jenkins ("Jenkins"), and Timothy Enix ("Enix") (collectively, "Defendants") are named in a 46-count Second Superseding Indictment (Dkt. 33) ("Indictment") returned on March 16, 2016, alleging various crimes, including a conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO"), in connection with the operation of the Kingsmen Motorcycle Club ("KMC"). The alleged acts of the charged RICO conspiracy include the execution-style murders of two KMC members, Paul Maue ("Maue") and Daniel "DJ" Szymanski ("DJ Szymanski"), which occurred outside the KMC North Tonawanda Chapter clubhouse during the early morning hours of September 6, 2014. Defendants are currently on trial for the charges alleged in the Indictment.
During jury selection, Defendants objected to the presence of members of DJ Szymanski's family in the courtroom; one *447 of those family members, Kristen Szymanski ("Kristen"), has been identified by the Government as a potential witness in the case. The Court has sequestered witnesses in this case pursuant to Fed. R. Evid. 615. Notwithstanding her status as a potential witness, the Government moved to assert Kristen's right not to be excluded from any public court proceeding as a family member of a crime victim. (Dkt. 1021). Given Defendants' professed concerns that the presence of members of the public-and, more specifically, victims' family members[1] -could impede juror candor during individual voir dire, the Court considered alternative modes of conducting individual voir dire proceedings, such as conducting the questioning in chambers. As discussed on the record, the Court ultimately determined that it would not exclude Kristen from the courtroom nor would it conduct the individual voir dire in chambers. Instead, the Court elected to conduct the individual voir dire in the open courtroom, but it invited prospective jurors to discuss personal matters at sidebar. The purpose of this Decision and Order is to memorialize the Court's rationale for those determinations in greater detail.
BACKGROUND
I. Jury Selection Procedures
The jury selection process in this case was extensive, having been conducted over the course of several weeks and consisting of three phases: (1) hardship screening followed by completion of a 10-page written questionnaire; (2) individual voir dire; and (3) group voir dire.
Jury selection began on January 16, 2018, with the hardship screening phase, and lasted for four days. During the hardship screening phase, the Court first questioned prospective jurors regarding hardship excuses related to the expected four-month length of the trial. It then dismissed certain prospective jurors on hardship grounds and instructed the remaining prospective jurors to complete a juror questionnaire.
Those questionnaire responses are subject to this Court's Protective Order, which states, inter alia, that they are to be used only in connection with jury selection, and may not be disclosed, shown, or distributed in any manner to third parties. (Dkt. 983). Moreover, the questionnaire informed each prospective juror that the information provided would be used only by persons associated with the case for purposes of selecting a jury. (Dkt. 983-1).
Individual voir dire, which began on January 24, 2018, took place over the course of five separate days. The Court individually questioned certain prospective jurors about their questionnaire responses. After the individual questioning of each prospective juror, the Court either dismissed the prospective juror or instructed them to return for group voir dire. The parties made additional cause challenges, and ultimately, group voir dire proceeded on February 7, 2018, with a jury of 18 persons (12 jurors and 6 alternates) selected.
II. Attendance by a Victim's Family Members
DJ Szymanski is one of the victims of the alleged murders on September 6, 2014. As alleged in the Indictment, Jenkins, acting at the direction of Pirk, shot DJ Szymanski and Maue behind the North Tonawanda KMC Chapter clubhouse. (See Dkt.
*448 33 at 24). Among the individuals listed on the Government's witness list are Sigmund Szymanski, father of DJ Szymanski, and Kristen, sister of DJ Szymanski. (Dkt. 923 at 68). The Government contends that Kristen Szymanski "will testify regarding her general knowledge of the operations and details of the KMC as well as her late brother's activities related to the KMC." (Id. ). Kristen, at times accompanied by her mother, Mrs. Szymanski,[2] has attended some days of jury selection.
Defendants objected to the presence of Kristen during the jury selection. The Government filed a motion to assert Kristen's right not to be excluded from any public court proceeding as a family member of a crime victim. (Dkt. 1021 at 1). The Government contended that the right to be present includes voir dire, and that Defendants had provided "no evidence, let alone clear and convincing evidence, that her testimony will be altered by her presence at the voir dire." (Id. at 2). The Government also argued that the Court should allow prospective jurors to discuss sensitive matters at sidebar if they preferred to do so, rather than conduct all individual voir dire in chambers or close the courtroom.
Defendants maintained that Kristen should be excluded in light of the unique characteristics of the Court's individual voir dire procedure, involving prospective jurors' confidential questionnaire responses. Defendants argued that, if a prospective juror ultimately served on the trial jury and later became aware that Kirsten had observed the individual voir dire and was privy to the juror's personal information, then that may influence the prospective juror's decision as to a verdict. As a result, Defendants asked that the Court conduct individual voir dire in chambers and agreed to waive their appearance for that portion of the proceedings.
As noted above, the Court ultimately agreed with the Government, and conducted the individual voir dire in the public courtroom, explaining that prospective jurors could ask to discuss any sensitive or personal matter at sidebar. Very few prospective jurors opted for the sidebar. Over the course of the five-day individual voir dire, as well as throughout the entire jury selection process, Kristen and Mrs. Szymanski, as well as other members of the public, sometimes occupied the courtroom gallery. The Court observed no difference in the candor of prospective jurors during individual voir dire where members of the public attended (including Kristen and Mrs. Szymanski), as compared to questioning without any members of the public in attendance. Likewise, the Court did not observe any behavior by Kristen or her mother that could in any way be construed as attempting to influence the prospective jurors. Rather, when present, the Szymanskis simply sat and observed the proceedings.
DISCUSSION
I. Exclusion of Victim Witness
Federal Rule of Evidence 615 allows the Court to exclude non-party witnesses so that they cannot hear other witnesses' testimony. Fed. R. Evid. 615. Four categories of persons are excepted from Rule 615, including "a person authorized by statute to be present." Fed. R. Evid. 615(d). "And, it turns out, Congress created just such an exception for crime victims when it enacted the CVRA and gave crime victims [t]he right not to be excluded from any ... public court proceeding.' " In re Mikhel, 453 F.3d 1137, 1139 (9th Cir. 2006) (alterations in original) (quoting *449 18 U.S.C. § 3771(a)(3) ); see also, e.g., United States v. Edwards, 526 F.3d 747, 757-58 (11th Cir. 2008) (explaining that Rule 615 recognizes an exception for persons authorized by statute to be present, and that the CVRA provides such a statutory exception for crime victims to be present); United States v. Jim, No. CR 10-2653 JB, 2012 WL 119599, at *2 (D.N.M. Jan. 8, 2012) (same); United States v. Okun, Criminal No. 3:08cr132, 2009 WL 790042, at *2 (E.D. Va. Mar. 24, 2009) (same); United States v. Johnson, 362 F.Supp.2d 1043, 1056 (N.D. Iowa 2005) (same). In other words, the right of crime victims not to be excluded "effectively trumps Federal Rule of Evidence 615." United States v. Turner, 367 F.Supp.2d 319, 332 (E.D.N.Y. 2005). This is also consistent with Federal Rule of Criminal Procedure 60, which implements several provisions of the CVRA and provides that "[t]he court must not exclude a victim from a public court proceeding involving the crime, unless the court determines by clear and convincing evidence that the victim's testimony would be materially altered if the victim heard other testimony at that proceeding." Fed. R. Crim. P. 60(a)(2) ; see also Fed. R. Crim. P. 60 advisory committee's note to 2008 adoption ("Although Rule 615 requires the court upon the request of a party to order the witnesses to be excluded so they cannot hear the testimony of other witnesses, it contains an exception for 'a person authorized by statute to be present.' Accordingly, there is no conflict between Rule 615 and this rule, which implements the provisions of the Crime Victims' Rights Act.").
Moreover, as the Government points out, courts have allowed victim-witnesses to be present at voir dire, citing the CVRA. See United States v. Tsarnaev, Civil Action No. 13-10200-GAO, 2015 WL 631330, at *1 (D. Mass. Feb. 13, 2015) ; United States v. Mitchell, No. 2:08CR125DAK, 2010 WL 4386915, at *10 (D. Utah Oct. 29, 2010).
A crime victim's right not to be excluded is not unlimited. Section 3771(a)(3) provides that the Court may exclude a crime victim if "the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding." § 3771(a)(3). Section 3771(b)(1) provides that, "[b]efore making a determination described in subsection (a)(3), the court shall make every effort to permit the fullest attendance possible by the victim and shall consider reasonable alternatives to the exclusion of the victim from the criminal proceeding." 18 U.S.C. § 3771(b)(1). The Court must clearly state on the record the reasons for excluding a victim-witness. Id.
The standard for exclusion requires the district court to "find by clear and convincing evidence that it is highly likely, not merely possible, that the victim-witness will alter his or her testimony." Mikhel, 453 F.3d at 1139. "A mere possibility that a victim-witness may alter his or her testimony as a result of hearing others testify is therefore insufficient to justify excluding him or her from trial." Id. Here, Defendants presented no evidence-let alone clear and convincing evidence-that Kristen[3] will alter her testimony as a result *450 of hearing the individual voir dire proceedings.
II. Closure of Voir Dire Proceedings
Although Defendants failed to establish that Kristen should be excluded from the jury selection, a related issue was whether, in light of Defendants' concerns that the victim-witness's presence will affect prospective jurors' candor during individual voir dire, any closure of the courtroom was warranted. For the reasons set forth below, the Court concluded that it would not be appropriate to conduct individual voir dire in chambers; instead, the Court invited prospective jurors to discuss any sensitive or personal matters at sidebar and otherwise allowed the individual voir dire proceedings to remain open to the public.
A. Legal Standard for Closure of Voir Dire
The Supreme Court established a qualified First Amendment right of access to voir dire in Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). In that case, which concerned access to voir dire by the press, the Supreme Court observed that "[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system," and so "the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown." Id. The Supreme Court enunciated a standard for overcoming the presumption of openness:
The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.
Id. at 510. Applying that standard, the Supreme Court in Press-Enterprise concluded that the trial court could not constitutionally close all but three days out of six weeks of voir dire to protect prospective jurors' privacy interests without considering alternatives to closure and without articulating findings to support the broad closure order. Id. at 511-12, 104 S.Ct. 819.
Two Second Circuit cases- United States v. King, 140 F.3d 76 (2d Cir. 1998), and ABC, Inc. v. Stewart, 360 F.3d 90 (2d Cir. 2004) -serve as guideposts on the issue of closure of voir dire. See United States v. Shkreli, 260 F.Supp.3d 257, 260 (E.D.N.Y. 2017) (using King and Stewart as guidance on issue of closure of voir dire ).
In United States v. King, the Second Circuit reviewed the district court's limited closure of voir dire in the trial of boxing promoter Don King. 140 F.3d at 78. The district court concluded that limited closure was necessary based on its findings "(1) that candor on the part of prospective jurors is of particularly great importance in this case, and (2) that, absent a degree of juror privacy, such candor is likely to be restricted." Id. at 79 (internal quotation marks omitted). The Second Circuit affirmed the closure, finding that the district court had appropriately made explicit findings to support the limitations after considering reasonable alternatives. Id. at 82. The Second Circuit found that the King case, in which discovering prospective jurors' attitudes about racial bias was particularly important, was "that unusual case *451 where the fairness of a trial, or at least the voir dire phase, that is usually promoted by public access is seriously at risk of being impaired unless some modest limitation on access is imposed." Id. at 83.
Whereas in King the Second Circuit upheld a closure order, in Stewart, the Second Circuit vacated a district court's closure order. 360 F.3d at 106. In Stewart, which was a case that stemmed from the criminal prosecution of celebrity Martha Stewart and her former stockbroker, the district court employed a two-part voir dire process where "[p]rospective jurors would first be screened based on their responses to a lengthy questionnaire," and "[m]embers of the remaining venire panel would then be individually questioned, outside the presence of other prospective jurors, in the district judge's robing room." Id. at 94. Members of the press were not allowed to be present for the voir dire proceedings conducted in the robing room. Id. at 95.
The Second Circuit in Stewart concluded that the district court's factual findings were inadequate to establish a substantial probability that open voir dire proceedings would have prejudiced the defendants' right to an impartial jury, reasoning as follows. Id. at 101-02. First, the district court did not find (and the record did not suggest) that the press violated a court order or otherwise conducted themselves improperly while covering the case. Id. at 101. Second, although jurors were likely to have preconceptions about Stewart, that fact alone could not justify closure:
[P]rospective jurors are likely to have preconceptions about the defendants in almost every criminal case that attracts media attention. If this fact alone were sufficient to warrant closure, then courts could routinely deny the media access to those cases of most interest to the public, and the exception to openness would swallow the rule.
Id. Third, the Second Circuit could discern no basis for the district court's conclusion that prospective jurors would be unwilling to disclose preconceptions about the defendants in front of the press, but not in front of the defendants, who were allowed to be present for voir dire proceedings in the robing room. Id. Fourth, unlike King, where voir dire explored sensitive issues such as the jurors' attitudes about race, the district court had not identified similarly sensitive topics that were to be explored during the voir dire in Stewart. Id. at 101-02,. In short, the case was no different than any other high-profile case, except for the degree of media coverage. Id. The Second Circuit also found that alternative, more narrowly tailored methods of ensuring the candor of jurors were available as an alternative to closure. Id. at 105. Those alternatives included "partial closure," where the press would be allowed to attend limited portions of the voir dire examination. Id.
B. Application
Defendants' right to a fair trial is an overriding interest in this case. See Stewart, 360 F.3d at 98-99 ("Where the competing interest asserted is the right of the accused to a fair trial, ... the following balancing test [is used] for determining whether closure is appropriate: The proceeding shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." (internal quotation marks and alterations omitted) ). That interest of Defendants competes, to some extent, with the interest of the public in open voir dire proceedings.
*452 Like the court in King, this Court finds that "(1) that candor on the part of prospective jurors is of particularly great importance in this case, and (2) that, absent a degree of juror privacy, such candor is likely to be restricted." King, 140 F.3d at 79 (internal quotation marks omitted). Because of the nature of the case-involving allegations of murder, violence, and drug use-the questionnaires spanned 10 pages and asked prospective jurors about several personal issues, including the following: criminal history of the prospective jurors or their family members, whether the prospective juror or a close relative had been the victim of a crime or experienced domestic violence, and whether the prospective juror or a close family member or friend had been treated for drug addiction. (See Dkt. 983-1). The Court promised the potential jurors that the responses to the questionnaires would remain confidential. (See Dkt. 983). Prospective jurors have been candid about these sensitive topics in their written responses to the questionnaire and during individual voir dire , where the Court asked follow-up questions about the questionnaire responses. That candor benefitted all parties in the case as they engaged in the process of selecting an unbiased jury that will consider the trial evidence and instructions on the law without prejudice, sympathy, or bias.
Although important, juror candor is, by itself, insufficient to restrict access to voir dire. See, e.g., Stewart, 360 F.3d at 102 ("The mere fact that the suit has been the subject of intense media coverage is not, however, sufficient to justify closure."). The Court considered alternative modes of conducting the individual voir dire proceedings and concluded that the use of sidebar during otherwise open individual voir dire proceedings was appropriate, rather than either complete closure or partial closure such as holding individual voir dire proceedings in chambers.
This case has attracted some measure of pretrial publicity (see Dkt. 434-5; Dkt. 434-6; Dkt. 833-1), but, unlike in King, the publicity has not been particularly sensational or made Defendants notorious due to unrelated controversial issues. See King, 140 F.3d at 79-80 (describing racially-tinged press coverage comparing King to crime families and recent HBO drama about King in which it described him as a "devil" or "villain"). Nor did the line of questioning at individual voir dire focus on controversial issues that a juror might be reluctant to discuss publicly, such as a racism or sexism. See id. In fact, many of the questions that the Court asked during individual voir dire were no different or more sensitive than those that the Court asks prospective jurors in front of the venire in a typical voir dire. For example, in individual voir dire, prospective jurors discussed their schedules and views on motorcycle clubs, firearms, and drug use-topics about which jurors are generally candid in a public setting. As a result, the need for the degree of juror privacy that closure of the courtroom or in-chambers individual voir dire would afford is less in comparison to King. See id. ; see Stewart, 360 F.3d at 101-02 (distinguishing King because "[n]o similarly sensitive or contentious lines of questioning were ... identified by the district court," and stating, in contrast, that "[i]t is ... difficult to imagine a person losing his or her job because he or she acknowledged admiration for or animosity toward Stewart").
As a result, the Court did not conclude that closure of the courtroom-either in total, or in part by conducting individual voir dire in chambers-was necessary to protect Defendants' rights to a *453 fair trial.[4] If the Court were to require closure, the restrictions must be narrowly tailored; that is, the restrictions must be no broader than necessary to assure juror candor without infringing on the public's First Amendment interest in open trials. See Stewart, 360 F.3d at 104 (discussing narrow tailoring requirement); King, 140 F.3d at 83 (same). Offering the use of sidebar is no more restrictive than necessary to ensure prospective jurors' candor during individual voir dire. Consistent with the Court's usual practice, the sidebars were inaudible to observers in the audience (including the victim-witness), but conducted in public and recorded in a sealed transcript. The individual voir dire proceedings were otherwise conducted in an open, public courtroom, consistent with the presumption of openness and in a manner that did not significantly limit the ability of the public (including the victim-witness) to observe voir dire. Moreover, the use of sidebars has some advantages over a preemptive closure:
When there is a need for sensitive questions to be put to prospective jurors ..., the better practice is not to close the voir dire in anticipation of such questioning, but rather to explain the nature of the questions that must be asked and allow the prospective jurors to request questioning in camera. This "has the advantage of necessitating that prospective jurors make an affirmative request to be interrogated out of the view of the press and public [and] allows the trial court to exercise its discretion about whether closure is merited, relying on specific information rather than mere speculation."
6 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 22.3(a) (4th ed. 2015) (alteration in original). The practice also has the advantage of allowing Defendants to remain present in the courtroom and available to consult with their attorneys, whereas Defendants would not be present for in-chambers individual voir dire proceedings. In sum, the Court finds that the use of sidebars as needed was a reasonable alternative to closure that adequately protects Defendants' rights to a fair trial.
In so ruling, the Court acknowledges that it did not find Defendants' concerns about the presence of the victim's family wholly unpersuasive. However, in light of the victim-witness's right not to be excluded from the courtroom, and considering the presumption of openness that applies to voir dire proceedings, the Court concluded *454 that the use of sidebar was an appropriate compromise among the competing interests at play. See United States v. Bruno, 700 F.Supp.2d 175, 182 (N.D.N.Y. 2010) ("In criminal trials, there are a series of competing, and at times overlapping, interests. The public's access rights and the accused's constitutional right to a public trial converge with the accused's right to trial by an impartial jury. And these competing interests further vie with the jurors' 'legitimate privacy interests,' compelling interests that protect sensitive information that may endanger, harass, intimidate, or embarrass." (quoting Press-Enterprise, 464 U.S. at 511-12, 104 S.Ct. 819 ) ).
Finally, the Court notes that effectiveness of the practice adopted here-use of sidebars as needed-was borne out in practice. Despite the presence of the victim's family during some portions of individual voir dire, those days where members of DJ Szymanski's family were present were not meaningfully different from the days where family members were not present. In the Court's view, the degree of privacy that the use of sidebar afforded to the prospective jurors appears not to have restricted the candor of prospective jurors during individual voir dire. Only a few prospective jurors requested a sidebar, and the Court has no reason to believe that the prospective jurors were less forthcoming in their answers than they would have been during individual voir dire conducted in chambers.
CONCLUSION
For the reasons set forth above, the Court concluded that Kristen Szymanski, as a victim for purposes of the CVRA, should not be excluded from the courtroom in the absence of clear and convincing evidence that her testimony would be materially altered if she were allowed to observe the proceedings. Accordingly, the Government's motion to assert a victim's right to be present at voir dire was granted. (Dkt. 1021). Further, the Court determined that individual voir dire will not be conducted in chambers; instead, the Court invited prospective jurors to discuss any sensitive or personal matters at sidebar and otherwise allowed the individual voir dire proceedings to remain open to the public.
SO ORDERED.

Of course, prospective jurors did not know the identity of audience members in the courtroom's gallery, but defense counsel argued that they would learn Kristen's identity once she testified.

Mrs. Szymanski is not on the Government s witness list. (See Dkt. 923).

Kristen is a "victim" within the meaning of the CVRA. A "victim" is defined to include "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia."18 U.S.C. § 3771(e)(2)(A). Moreover, "[i]n the case of a crime victim who is ... deceased, ... family members ... may assume the crime victim's rights under this chapter...." Id. § 3771(e)(2)(B). As a family member of Szymanski, who is now deceased, Kristen is a victim for purposes of the CVRA. The Court also notes that its analysis of a victim-witness's right to be present focuses on Kristen and does not include Mrs. Szymanski because Mrs. Szymanski is not on the Government's witness list.

Complete closure of the courtroom faces an additional obstacle: notice requirements. See United States v. Doe, 629 Fed.Appx. 69 (2d Cir. 2015). The procedures for closing a proceeding are as follows:
"[A] motion for courtroom closure should be docketed in the public docket files maintained in the court clerk's office. The motion itself may be filed under seal, when appropriate, by leave of court, but the publicly maintained docket entries should reflect the fact that the motion was filed, the fact that the motion and any supporting or opposing papers were filed under seal, the time and place of any hearing on the motion, the occurrence of such hearing, the disposition of the motion, and the fact of courtroom closure, whether ordered upon motion of a party or by the Court sua sponte. Entries on the docket should be made promptly, normally on the day the pertinent event occurs."
Id. at 73 (citations omitted) (quoting In re Herald Co., 734 F.2d 93, 102-03 (2d Cir. 1984) ). The Second Circuit has "never provided any strict minimum amount of time for the notice requirement," Doe, 629 Fed.Appx. at 73, and "has indicated that such 'notice requirements must remain sufficiently flexible to accommodate the exigencies of the litigation process and avoid unwarranted delays,' " id. (quoting In re Herald Co., 734 F.2d at 102 ). However, in this case, the public received no notice that would allow an adequate opportunity to challenge courtroom closure.