887 F.2d 646
 58 USLW 2236, 16 Media L. Rep. 2384
 In re Petitions of MEMPHIS PUBLISHING COMPANY (88-6369),
d/b/a the Commercial Appeal (88-6106); RKO General, Inc.
d/b/a WHBQ-TV (88-6108), and Scripps Howard Broadcasting
Company, d/b/a WMC-TV Channel 5 (88-6107), Intervenors-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dana G. KIRK, Defendant-Appellee.
In re MEMPHIS PUBLISHING COMPANY (88-6406), Petitioner.
 Nos. 88-6106, 88-6107, 88-6108, 88-6369 and 88-6406.
 United States Court of Appeals,
Sixth Circuit.
 Submitted June 8, 1989.
Decided and Filed Oct. 13, 1989.
 
 S. Russell Headrick, Lucian T. Pera, S. Russell Headrick, Armstrong, Allen, Prewitt, Gentry, Johnston & Holmes, Memphis, Tenn., for intervenors-appellants.
 W. Hickman Ewing, Jr., U.S. Atty., Memphis, Tenn., for plaintiff-appellee.
 Frank J. Glankler, Jr., Glankler, Brown, Gilliland, Chase, Robinson & Raines, Memphis, Tenn., for defendant-appellee.
 Richard L. Hollow, McCambell & Young, Knoxville, Tenn., for amicus curiae Tennessee Press Ass'n.
 Before KEITH and NORRIS, Circuit Judges, and EDWARDS, Senior Circuit Judge.
 GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 
 
 1
 In this case we are required to consider petitions from organizations in the publishing or broadcasting business and the position of defendant-appellee Dana G. Kirk, who withdrew from this appeal. These proceedings are unique in that they pose possible conflicts between the First Amendment right to know what takes place in a judicial proceeding and the Sixth Amendment right to a fair trial.
 
 
 2
 At the outset, the case involved charges against the former head basketball coach at Memphis State University including income tax evasion, obstruction of justice and other offenses. The case attracted what is described in the record as "mammoth pretrial publicity." As a result of these circumstances, Judge Horton decided to use a device which emitted white noise during voir dire proceedings, making the questioning of one juror by the court or counsel inaudible to other potential jurors, and to the public and press attending the trial. Jury selection began on September 12, 1988, and continued through Thursday, September 15, 1988, when the jury was sworn. It should be noted that no objection was made initially to the use of the noise device.
 
 
 3
 On September 13, 1988, a question concerning this procedure was raised by a reporter employed by one of the intervenors.
 
 
 4
 The next day, several media organizations sought to intervene for the limited purpose of challenging the closure of voir dire proceedings and seeking open voir dire proceedings. Following argument, the court granted petitioners' motions to intervene for the limited purpose of challenging the closure of voir dire proceedings, but denied the petitions for open voir dire proceedings. The court decided:
 
 
 5
 that the right of Mr. Kirk to a fair and impartial trial might well be undermined by immediate expressions of such views as described above in the courtroom and by immediate publicity in the media of answers to questions given by potential jurors in this area, especially where opinions may be expressed relating to what may have been heard and discussed, read and discussed, opinions formed or present views on guilt or innocence or whether the government should have even sought an indictment of Mr. Kirk in this case. (Tr. 461) (emphasis added)
 
 
 6
 The court stated that a transcript of all voir dire proceedings, including those effectively closed to the public and press through the use of the noise device, would be available to the media and other interested persons "immediately upon the selection of a jury to try this case." On October 26, 1988, the transcript of the voir dire proceedings was filed with the clerk of court and made available, for a fee, to the intervenors.
 
 
 7
 The second issue raised in this appeal concerns certain statements made by the district court at the conclusion of the trial. On November 15, 1988, following approximately eight weeks of trial, the jury in the underlying criminal case returned its verdict, finding defendant guilty on five counts of the indictment and not guilty on four counts. Following the verdict, the district court told the jurors:
 
 
 8
 May I ask you one other thing before you leave, that is, do not talk about the case. You don't have to. No one can require you to do that. And should, down the road, it become necessary, you will hear from the court. So, if you will do that, we will appreciate it, also. Thank you. (Tr. 4).
 
 
 9
 Understandably confused by that statement, petitioners attempted to contact several of the jurors at the conclusion of the trial, but were rebuked in their attempts at interviews. Some of the jurors specifically referred to the statements of the district court in refusing to answer questions. Consequently, the petitioners filed a "Motion to Clarify Order Prohibiting Jurors From Communication With Others Concerning Criminal Case. Or, in the Alternative, To Vacate Said Order". The district court disposed of this motion with the single word "denied".
 
 I.
 
 10
 As to the voir dire issue, the instant case is controlled by the Supreme Court decision of Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ("Press-Enterprise I ") and its successor case, Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) ("Press-Enterprise II "). Both Press-Enterprise I and Press-Enterprise II hold that there is a fundamental guarantee of open public proceedings in criminal trials, which includes the proceedings for the voir dire examinations of potential jurors. 464 U.S. at 505-510, 104 S.Ct. at 821-824. Thus, there is a strong presumption of open voir dire examinations. Closure must be justified by the finding of an overriding governmental interest, and must be narrowly tailored to serve that interest. Id. at 510, 104 S.Ct. at 824, citing Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982).
 
 
 11
 In Press-Enterprise I, the Court noted "the [overriding] interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." 464 U.S. at 510, 104 S.Ct. at 824. More significantly, in Press-Enterprise II, the Court, in the context of a preliminary hearing but relying on Press-Enterprise I, wrote:
 
 
 12
 The First Amendment right of access cannot be overcome by the conclusory assertion that publicity might deprive the defendant [of the right to an impartial verdict]. 478 U.S. at 15, 106 S.Ct. at 2743.
 
 
 13
 It is our view that the naked assertion by the district court in this case that defendant's Sixth Amendment right to a fair trial "might well be undermined", without any specific finding of fact to support that conclusion, was insufficient to justify closure under Press-Enterprise I and PressEnterprise II. We thus reverse as to the voir dire issue.
 
 II.
 
 14
 The second issue in this case presents special problems. The petitioners urge this court to accept Judge Horton's post-trial statement to the jury as a gag order, while defendant Kirk maintains that it is mere advice.
 
 
 15
 As to this issue, the summary disposition of the district court by simply writing "denied" prevents effective appellate review. Thus, on this issue, we remand for clarification, mindful of the fact that if the trial court's statement were indeed a post-trial judicial gag order of the scope alleged by petitioners, it would trammel First Amendment values, and thus fail to pass Constitutional muster.
 
 
 16
 It must also be noted that petitioners in this appeal have also filed a motion for a writ of mandamus, presenting identical issues and arguments as addressed in issue two of this appeal. Since the issue is disposed of by this opinion, there is no need to address the merits of the writ of mandamus, which is DENIED.
 
 
 17
 ALAN E. NORRIS, Circuit Judge, concurring in part and dissenting in part.
 
 
 18
 While I concur in part II of the majority opinion, I do not believe that the district court's limited use of a device which emitted static and its withholding of the transcript of the voir dire until the jury was impaneled violated any rights secured by the United States Constitution and, therefore, respectfully dissent from the holding in part I.
 
 
 19
 Both the government and the defendant supported use of the noise device. It was not until the third day that intervenors voiced their concern. The public was not excluded from the courtroom, and the device was not used when general questions were posed to potential jurors as a group--it was employed only when potential jurors were questioned individually about their knowledge of the case and any opinions they may have formed on guilt or innocence. A transcript was made available as soon as the jury was impaneled.
 
 
 20
 Although I am not convinced that the procedure utilized was tantamount to closing the voir dire to the public, even if it were, circumstances warranted its use. To be sure, the Supreme Court, in Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), pointed out that the primacy of an accused's right to a fair trial "is difficult to separate from the right of everyone in the community to attend the voir dire," id. at 508, 104 S.Ct. at 823, and that there is a presumption of openness which may be overcome only by an overriding interest based upon a finding that closure is essential to preserve higher values and is narrowly tailored to serve that interest. Id. at 510, 104 S.Ct. at 824. Furthermore, a trial court must develop "findings specific enough that a reviewing court can determine whether the closure order was properly entered." Id. Under the circumstances of this case, that means we must determine whether the trial judge was warranted in concluding that defendant's right to a fair trial overrode the intervenors' qualified First Amendment right of access, Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 9, 106 S.Ct. 2735, 2740, 92 L.Ed.2d 1 (1986), and, if so, whether the limited remedy fashioned by the judge was suitably narrow. Manifestly, under that standard, the situation confronting the district judge must have posed a threat to defendant's right to a fair trial which was distinct from that which can generally be said to face any defendant in a criminal trial.
 
 
 21
 According to the thirty-seven page transcript memorializing the hearing conducted at intervenors' request, the trial judge repeatedly articulated his conclusion that the notoriety of the defendant and the publicity surrounding his prosecution by the government had created a uniquely sensitive situation that threatened his right to a fair trial. He was particularly concerned that prospective jurors not influence one another with opinions formed from the extensive publicity which had already surrounded the case, either by the prospective jurors hearing those opinions in voir dire questioning or learning of them through media coverage of the voir dire. This was not merely a "naked assertion" by the trial judge of a general concern that the defendant's rights might be undermined, but was instead an articulation of his specific belief that the notoriety surrounding the case and media coverage of the voir dire itself uniquely threatened the court's ability to assure the selection of an impartial jury to try this public figure. A more complete extract from the court's ruling is instructive:
 
 
 22
 What is objected to [by intervenors] is the individual questioning of prospective jurors who may have, for example, heard about and/or discussed the case, formed opinions about the case, heard others discuss the case or who may have formed an opinion about the guilt or innocence of the defendant.
 
 
 23
 The conduct of this very limited aspect of the jury selection process has been around a table in the courtroom in the presence of all parties in the courtroom but with the limitation that this limited discussion with individual prospective jurors, while seen, cannot be heard because of the use of an amplified noise device system which has been installed in this courtroom.
 
 
 24
 This court is well aware that there is a strong presumption of openness in criminal trials.
 
 
 25
 ....
 
 
 26
 This court is aware that public access plays a significant and positive role in the function of the jury selection process. The indictment by a Federal Grand Jury of former Memphis State University basketball coach, Dana Kirk, has generated mamouth [sic] pretrial publicity in this community and elsewhere.
 
 
 27
 ....
 
 
 28
 In this context the court decided that the right of Mr. Kirk to a fair and impartial trial might well be undermined by immediate expressions of such views as described above in the courtroom and by immediate publicity in the media of answers to questions given by potential jurors in this area, especially where opinions may be expressed relating to what may have been heard and discussed, read and discussed, opinions formed or present views on guilt or innocence or whether the government should have even sought an indictment of Mr. Kirk in this case.
 
 
 29
 This interest in a fair and impartial trial for Mr. Kirk and the confidence of the public that he, in fact, receives a fair trial, does in the court's judgment override in this very limited way the public's First Amendment right of access.
 
 
 30
 The procedure adopted by the court is also convenient and keeps the parties and the court in the courtroom and in public view at all times.
 
 
 31
 The court has in its judgment developed a procedure which is very narrowly tailored to achieve the ends described.
 
 
 32
 One is hard-pressed to suggest how the trial judge could have articulated more forcefully the threat to defendant's interest in a fair trial. He followed up by stating his intention to protect defendant's interests by a procedure narrowly tailored only to that purpose. Questioning prospective jurors, one at a time out of the hearing of other prospective jurors, would not suffice he said, since media coverage of that questioning made the opinions of those questioned available to other prospective jurors.
 
 
 33
 Beyond a generic assertion that the trial court's selected remedy infringed upon the public's general interest in promoting fair trials through "the continuing presence of neutral eyewitnesses at all stages of a criminal proceeding," intervenors have not suggested how, specifically, in this case, any reckonable prejudice redounded to the interests of the public or press. Understandably, one is hard-pressed to point out just what it was that was denied them that hurt them, since they were permitted to sit through the voir dire and received a transcript upon its completion. Perhaps intervenors employed so little imagination in that regard because the Supreme Court, by couching its balancing formula in terms of a "presumption of openness," 464 U.S. at 510, 104 S.Ct. at 824, can be said to have thrust the burden of demonstrating an overriding justification upon the party said to possess the primary right, id. at 508, 104 S.Ct. at 823, rather than upon the one said to enjoy only a qualified one. 478 U.S. at 9, 106 S.Ct. at 2740.
 
 
 34
 It is apparent from the transcript and the court's ruling that there was a substantial probability that the defendant's right to a fair trial would be prejudiced by permitting unlimited public access to the voir dire proceedings, and that the prejudice could best be prevented by the narrowly tailored remedy selected by the trial judge from among available alternatives. See 478 U.S. at 14, 106 S.Ct. at 2743. One wonders whether the majority contemplates any limits upon the ability of the news media to interfere with the orderly conduct of a criminal trial. If the prompt availability of a transcript does not satisfy the legitimate interests of intervenors in this case, will trial judges be required to include reporters in every sidebar conference with counsel?
 
 
 35
 Since other alternatives were considered and rejected in favor of a superior remedy under which the public was not physically excluded from the proceedings, the sound device was used only in response to certain questions, and a transcript was shortly made available to the public, I conclude that the trial court appropriately balanced the interests of the defendant and of the public by selecting a remedy that was a reasonable and narrowly tailored means of protecting the defendant's compelling interest in a fair trial.