**ABC, INC., et al., Appellants,**

v.

**Martha STEWART, Peter Bacanovic, Defendants,**

**United States of America, Appellee.**

**No. 04–0220–cr.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 26, 2004.

Decided: Feb. 18, 2004.

David A. Schulz (Cameron A. Stracher, Alia L. Smith, on the brief), Levine Sullivan Koch & Schultz, L.L.P., New York, N.Y., for Appellants.

Henry S. Hoberman, New York, N.Y., for Appellant ABC, Inc.

Robert Feinberg, New York, N.Y., for Appellant American Lawyer Media.

David H. Tomlin, New York, N.Y., for Appellant The Associated Press.

Charles Glasser, New York, N.Y., for Appellant Bloomberg, L.P.

Anthony Bongiorno, New York, N.Y., for Appellant CBS Broadcasting, Inc.

David C. Vigilante, Stacey Wolf, Atlanta, Ga., for Appellant Cable News Network, L.P., L.L.L.P.

Dianne Brandi, New York, N.Y., for Appellant Fox News Network, L.L.C.

Muriel Reis, New York, N.Y., for Appellant Fox Television Stations, Inc.

Barbara W. Wall, McLean, Va., for Appellant Gannett Co., Inc.

Anne B. Carroll, New York, N.Y., for Appellant Daily News, L.P.

Stuart D. Karle, New York, N.Y., for Appellant Dow Jones & Co., Inc.

Maya Windholz, New York, N.Y., for Appellant NBC, Inc.

Stephanie S. Abrutyn, New York, N.Y., for Appellant Newsday, Inc.

Jan F. Constantine, New York, N.Y., for Appellant NYP Holdings, Inc.

George Freeman, New York, N.Y., for Appellant The New York Times Co., Inc.

Thomas Kim, New York, N.Y., for Appellant Reuters.

Eric Lieberman, Washington, D.C., for Appellant The Washington Post Co.

Deborah E. Landis, Assistant United States Attorney (Jacob W. Buchdahl, Laura Grossfield Birger, Gary Stein, Assistant United States Attorneys, on the brief), for David N. Kelley, United States Attorney for the Southern District of New York, New York, N.Y., for Appellee.

Before: KATZMANN, B.D. PARKER, Circuit Judges, and PRESKA, District Judge.*

KATZMANN, Circuit Judge.

This case calls upon us to balance two weighty constitutional rights: the First Amendment right of the press and of the public to access criminal proceedings and the Sixth Amendment right of criminal defendants to a fair trial. A conglomeration of news organizations and publications has appealed from an order of the United States District Court for the Southern District of New York (Cedarbaum, *J.*) barring the media from attending the *voir dire* examinations of prospective jurors held in the district judge's robing room but providing for the release of the transcripts of the *voir dire* examinations. We conclude that, under the circumstances presented here, the district court erred in closing the *voir dire* proceedings. We therefore vacate the portion of the district court's or-

der denying the media contemporaneous access to the *voir dire.* We recognize that, because *voir dire* has already been completed, this remedy has no practical implications with respect to this case. We, nevertheless, decide the issues presented because the underlying dispute regarding the First Amendment right of access is capable of repetition in future cases yet likely to evade review.

## BACKGROUND

This case stems from the high-profile criminal prosecution of Martha Stewart, the founder and former chief executive officer of Martha Stewart Living Omnimedia, Inc. and the doyenne of the home-lifestyle industry, and of her former stockbroker, Peter Bacanovic. The criminal charges against Stewart and Bacanovic stem from Stewart's sale of 3,928 shares of stock in the biotech company, ImClone Systems, Inc., on December 27, 2001. Stewart made this sale just before ImClone's stock price plummeted following an announcement that the Food and Drug Administration had rejected the company's application for approval of its highly touted cancer-fighting drug. The government subsequently initiated an investigation into whether Stewart undertook this trade in violation of federal securities laws and regulations that prohibit trading on the basis of material, nonpublic information. The Superseding Indictment alleges, *inter alia,* that, after learning of these investigations, Stewart and Bacanovic "entered into an unlawful conspiracy to obstruct the investigations[,] to make false statements and provide false and misleading information regarding Stewart's sale of ImClone stock[,] and to commit perjury, all to conceal and cover up" the fact that Baconovic

* The Honorable Loretta A. Preska, of the United States District Court for the Southern District of New York, sitting by designation.

had provided Stewart with non-public information and that Stewart had traded on the basis of that information. Superseding Indictment, dated January 5, 2004 ¶ 23. Specifically, Stewart stands accused of conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371 (2000); making false statements, in violation of 18 U.S.C. § 1001 (2000); obstruction of agency proceedings, in violation of 18 U.S.C. § 1505 (2000); and securities fraud, in violation of 15 U.S.C. § 78j (2000). Bacanovic is charged with conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371 (2000); making false statements and documents, in violation of 18 U.S.C. § 1001 (2000); perjury, in violation of 18 U.S.C. § 1621 (2000); and obstruction of agency proceedings in violation of 18 U.S.C. § 1505 (2000).

From the start, the Stewart case found itself the focus of an unusually high level of media attention. Recognizing the problems presented in empaneling an unbiased jury under these circumstances, the district court, with the consent of both sides, devised a two-part *voir dire* process. Prospective jurors would first be screened based on their responses to a lengthy questionnaire. Members of the remaining venire panel would then be individually questioned, outside the presence of other prospective jurors, in the district judge's robing room. Before jury selection began, the government wrote to the court, expressing concern that members of the media would attempt to interview prospective jurors during jury selection on January 6, 2004, when questionnaires were to be distributed. As a result, the government requested, on behalf of all parties to the case, that the court remind representatives of the media that such contact was forbidden. In response, the district court issued an order, dated January 2, 2004, prohibiting the media from communicating with jurors or prospective jurors or with their family members until such time as that juror's or potential juror's service was complete. According to the district court, this measure was "necessary to ensure the integrity of [the] proceedings" as well as "the public's and the parties' overriding interest in a fair trial."

Following the distribution of questionnaires on January 6, 2004, counsel for Stewart, by letter dated January 7, 2004, advised the court that a posting had appeared on the website www.gawker.com, paraphrasing certain portions of the jury questionnaire. The author of the entry purported to be a prospective juror, and there is no evidence in the record to suggest otherwise; nor is there any indication that the media played a role in the disclosure. Nevertheless, citing this incident in support of its request, the government, by letter dated January 14, 2004, which was not docketed or made public until after the entry of the order here at issue, asked the district court to exclude the media from the *voir dire* proceedings scheduled to be conducted in the robing room and to prohibit the media from publishing or otherwise disclosing the identity of prospective jurors. This measure, the government represented, was necessary to ensure juror candor and thereby protect the "parties' right to a fair trial." That same day, several reporters wrote to the district court to inquire whether subsequent *voir dire* proceedings would be held in open court and, if not, to request that the court consider allowing pool reporters to attend the sessions.[1] The reporters noted that

---

1. The term pool reporters refers to "a small number of reporters who have access to news sources and pass information to other jour- nalists." *Oxford English Dictionary* (2d ed.1999).

pool reporters had been effectively employed during *voir dire* examinations in the prosecutions of Imelda Marcos and of Sheik Omar Abdel Rahman and his co-conspirators.

Notwithstanding this request, without affording members of the media notice or an opportunity to be heard, the district court issued an order on January 15, 2004 (the "January 15 Order") providing that "no member of the press [could] be present for any *voir dire* proceedings [to be] conducted in the robing room" and that, instead, "a transcript of each day's *voir dire* proceedings [would] be made public the following day, with the names of prospective or selected jurors redacted from the transcripts, as well as such deeply personal information as any juror [should] reasonably request not be made public." *United States v. Stewart*, No. 03 Cr. 717, slip op. at 3, 2004 WL 65159, 2004 U.S. Dist. LEXIS 426 (S.D.N.Y. Jan. 15, 2004). In support of this ruling, the January 15 Order set forth the following factual findings:

> WHEREAS, the proceedings in this case have generated widespread and intense media coverage;
>
> WHEREAS, the "press" as used in this Order includes representatives of the print, broadcast and internet media, sketch artists, photographers, free-lance journalists, authors, and writers;
>
> WHEREAS, portions of the jury questionnaire provided to prospective jurors on January 6, 2004 were disclosed to the public in violation of this Court's directives; and
>
> There has been considerable speculation in the press concerning the identities of prospective jurors, and there is a substantial likelihood that some members of the press may disclose the names of prospective or selected jurors

> with their responses to *voir dire* questions;
>
> WHEREAS, there is a substantial risk that such publication or the possibility of such publication would prevent prospective jurors from giving full and frank answers to questions posed to them during *voir dire;*
>
> WHEREAS, in a case that has generated such widespread publicity, it is essential that prospective jurors disclose what they have read or heard about defendants, and what opinions or preconceptions they hold about defendants; *see United States v. King*, No. 94 Cr. 455(LMM), 1998 WL 50221, at *6 (S.D.N.Y. Feb 5, 1998), *aff'd* 140 F.3d 76 (2d Cir.1998).
>
> WHEREAS, without such candor on the part of prospective jurors, there is a substantial risk that defendants' absolute right to a fair trial and an impartial jury will be impaired;
>
> WHEREAS, at the request of all of the parties, individual *voir dire* of each prospective juror will take place in the robing room;
>
> WHEREAS, the Court, following *Press–Enterprise Co. v. Superior Court of California*, 464 U.S. 501 [104 S.Ct. 819, 78 L.Ed.2d 629] (1984), and *United States v. King*, 140 F.3d 76 (2d Cir. 1998), has chosen an alternative less restrictive than completely closing *voir dire*, by permitting a redacted transcript of each day's *voir dire* proceedings to be published the following day;
>
> WHEREAS, for the reasons stated in *King*, 1998 WL 50221 at *7, there is no alternative that adequately ameliorates the chilling effect that the presence of members of the press in the robing room would be likely to have on juror candor . . . .

*Id.* slip op. at 1–2.

Counsel for the appellants, a coalition of news organizations and publications (the

"Media Coalition"),[2] immediately moved to vacate or modify the January 15 Order. Specifically, the Media Coalition challenged three aspects of the January 15 Order as unconstitutional abridgements of the First Amendment: (1) its closure of the *voir dire* proceedings scheduled to be administered in the robing room; (2) its provision for juror anonymity; and (3) its imposition of a prior restraint on the publication of jurors' names, regardless of how the media discovered such names. At an in-court hearing held to address the motion on January 16, 2004, the district court elaborated on the factual basis for the January 15 Order:

> [T]his is not an ordinary high-profile case. I have tried many over the years.
>
> This is a case in which the press is interested in all sorts of things in which I have never seen as much press interest in a case and, as I say, I had many high-profile cases and we have members of the press and understandably, they want to do their jobs, and I have great sympathy for everybody's need to do his job, but we have had the most remarkable efforts to approach jurors who came to fill out questionnaires after I issued an order prohibiting such efforts to approach the jurors.
>
> We have had a remarkable amount of extraordinary press effort to treat many aspects of the case which have nothing to do with the trial of the case or the merits of the case or what will the evidence be because there seems to be— and I do not say this critically—an ex-

traordinary interest quite beyond the public's right to know.

In addition, the district court remarked:

> This is something unique about this case because there has been so much public pronouncement of opinions that different people have been exposed to. And people have formed judgments. I have already seen it. Many people have already formed judgments, prejudged. I have read commentators who have already made up their minds, who are read by potential jurors. The jurors who are totally influenced by any of them, either for or against or however, are not impartial jurors and that is what the purpose of the *voir dire* is and in this case, it is not as easy a process because of that.

These attributes of the case, the district court explained, distinguished it from other high-profile prosecutions, such as the trials of Leona Helmsley, Imelda Marcos, and Vincent Gigante, and necessitated closure of the *voir dire* proceedings to encourage juror candor, thereby "protect[ing] the defendants' right to an impartial jury." Accordingly, the district court declined to vacate or significantly modify the January 15 Order. The district court did, however, clarify that only the names of venire members would be redacted from the *voir dire* transcripts.[3]

This appeal, which challenges only the district court's closure of the *voir dire* examinations, followed. The district court denied the Media Coalition's request for a stay of *voir dire* pending appeal, and the Media Coalition did not seek such a stay

---

**2.** The members of the Media Coalition include: ABC, Inc.; American Lawyer Media; The Associated Press; Bloomberg, L.P.; CBS Broadcasting, Inc.; Cable News Network, L.P., L.L.L.P.; Fox News Network, L.L.C., Fox Television Stations, Inc.; Gannett Co., Inc.; Daily News, L.P.; Dow Jones & Co., Inc.; NBC, Inc.; Newsday, Inc.; NYP Holdings, Inc.; The New York Times Co., Inc.; Reuters; and The Washington Post Co.

**3.** The district court also clarified other aspects of the January 15 Order not material to this appeal.

from this Court. Consequently, individual *voir dire* of prospective jurors commenced on January 20, 2004, and concluded on January 23, 2004.

## DISCUSSION

### I. Jurisdiction

■ Though not challenged by the parties, we first consider the appealability of the January 15 Order under 28 U.S.C. § 1291 (2000), in light of what appears to be its interlocutory nature. As our prior decisions make clear, the January 15 Order is here appealable for two reasons. First, we have squarely held that "an order of closure is a final decision as to an intervenor within the 'collateral order' doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541 [69 S.Ct. 1221, 93 L.Ed. 1528] [ (1949) ]." *In re Herald Co.,* 734 F.2d 93, 96 (2d Cir.1984). By hearing the Media Coalition's motion, the district court in effect allowed the Media Coalition to intervene in the pending criminal proceeding for the limited purpose of challenging the January 15 Order, and the Media Coalition can therefore appeal from that Order. Second, we have observed that where, as here, the "[a]ppellants' claims could have been treated by the district court as a new civil case, as opposed to an intervention in the pending criminal case, and the orders would have been final in that case[,][n]o jurisdictional significance should attach simply because the district court chose to treat appellants as intervenors in the criminal proceeding." *In re New York Times Co.,* 828 F.2d 110, 113 (2d Cir.1987); *accord United States v. Suarez,* 880 F.2d 626, 628–29 (2d Cir.1989).

■ The existence of statutory jurisdiction does not, however, end our inquiry. Pursuant to Article III of the Constitution, we have jurisdiction only over live cases and controversies. *See In re Burger Boys, Inc.,* 94 F.3d 755, 759 (2d Cir.1996); *Ar-*thur v. Manch,* 12 F.3d 377, 380 (2d Cir. 1993); *Olin Corp. v. Consol. Aluminum Corp.,* 5 F.3d 10, 17 (2d Cir.1993). Therefore, under the mootness doctrine, "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party," we must dismiss the case, rather than issue an advisory opinion. *Church of Scientology v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992). The government thus contends that the completion of *voir dire* proceedings, access to which is the only relief sought by the Media Coalition, renders this case moot.

■ But the Supreme Court has recognized that a claim, though technically moot, is nevertheless justiciable where the underlying dispute is "capable of repetition, yet evading review." *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 6, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II* ) (internal quotation marks omitted); *accord Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir.2001); *Altman v. Bedford Cent. Sch. Dist.,* 245 F.3d 49, 71 (2d Cir.2001). A case falls within this exception to the mootness doctrine, where "(1) the challenged action was in duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Irish Lesbian and Gay Org. v. Giuliani,* 143 F.3d 638, 647–48 (2d Cir.1998) (internal quotation marks omitted). We find that these requirements are satisfied here. Orders closing criminal trials in general, and *voir dire* proceedings in particular, are almost always in effect for only a short time and therefore generally cannot be fully litigated before the closed proceedings have terminated; and it is reasonably likely that members of the media will continue to

seek access to *voir dire* sessions in high-profile criminal cases, such as this one, where the district court might fear that many venire members will have preconceived notions about one or more of the defendants. The government's argument that this case presents "unique circumstances" and is thus incapable of repetition is belied by its own contention that "the facts and circumstances" of this case "bear a striking resemblance to those in *King*." Indeed, courts that have considered this question have almost uniformly found that closure orders are capable of repetition yet evade review. *See, e.g., Press–Enterprise II*, 478 U.S. at 6, 106 S.Ct. 2735; *United States v. Antar*, 38 F.3d 1348, 1356 (3d Cir.1994); *United States v. Simone*, 14 F.3d 833, 836–37 (3d Cir.1994); *In re S.C. Press Ass'n*, 946 F.2d 1037, 1039 (4th Cir. 1991); *United States v. Peters*, 754 F.2d 753, 757–58 (7th Cir.1985); *United States v. Brooklier*, 685 F.2d 1162, 1165 (9th Cir. 1982).

## II. Legal Principles

Chief Justice Burger, writing for a plurality of the Court, announced in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), that the "right to attend criminal trials is implicit in the guarantees of the First Amendment," and that "without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and of the press could be eviscerated." *Id.* at 580, 100 S.Ct. 2814 (internal quotation marks omitted). This First Amendment right of access, the Supreme Court has explained, derives from two features of the criminal justice system: "First, the criminal trial historically has been open to the press and [the] general public"; and second, "[p]ublic scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both

the defendant and to society as a whole." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 605–06, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). In short, the right is rooted in "both logic and experience." *Id.* at 606, 102 S.Ct. 2613. The Supreme Court has further recognized that the guarantee of open public proceedings in criminal trials extends to the *voir dire* examination of potential jurors. *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 504–10, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*Press–Enterprise I* ).

 The constitutional right of access, however, is not absolute, and must, in certain circumstances, "give way ... to other rights or interests," *Waller v. Georgia*, 467 U.S. 39, 45, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), such as the defendant's Sixth Amendment right to a fair trial or the privacy interests of prospective jurors. *Press–Enterprise I*, 464 U.S. at 510–11, 104 S.Ct. 819. But the Supreme Court has made clear that the presumption of openness cannot easily be overcome. In the specific context of access to *voir dire* examinations, the Court stated in *Press–Enterprise I*:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

464 U.S. at 510, 104 S.Ct. 819. Where the competing interest asserted is the right of the accused to a fair trial, the Supreme Court in *Press–Enterprise II* fashioned the following balancing test for determining whether closure is appropriate: "[T]he [proceeding] shall be closed only if specific findings are made demonstrating that,

first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." 478 U.S. at 14, 106 S.Ct. 2735.

We applied these standards in *United States v. King,* 140 F.3d 76 (2d Cir.1998), to a limited closure of *voir dire* proceedings. The orders at issue in *King* denied press access to transcripts of *in camera* individual *voir dire* of prospective jurors until a jury was empaneled as well as to the transcripts of the *voir dire* examinations from the defendant's previous trial, which had ended in a mistrial. In entering these orders, the district court had found that juror candor regarding attitudes toward defendant Don King, who had been a prominent promoter of boxing matches, was of particularly great moment for two equally important reasons (among others): because King had been the subject of considerable press attention, and because this attention concerned "the delicate area of possible racial bias." *United States v. King,* 911 F.Supp. 113, 117 (S.D.N.Y.1995). The district court had explained: "It is no doubt a difficult thing for any person to admit to any degree of racial bias, but to do so for publication might well require what the theologians used to call heroic virtue. The importance of *voir dire* in uncovering racial bias would be hard to overestimate." *Id.* at 117. *See also United States v. King,* No. 94 Cr. 455(LMM), 1998 WL 50221 at *2, 1998 U.S. Dist. LEXIS 1233 at *5 (S.D.N.Y. Feb. 5, 1998) ("The Court adheres to the conclusions, expressed in the 1995 Decision, 911 F.Supp. at 117–18, . . . that candor on the part of prospective jurors is of particularly great importance in this case and that, absent a degree of juror privacy, such candor is likely to be restricted. Prospective jurors, if made aware that their views

will be publicly disseminated in the next day's newspapers or radio or television broadcasts, will be under pressure not to express unpopular opinions relevant to their choice as trial jurors."). In these circumstances, we affirmed the closure orders.

## II. Application

### A. Closure

■ As a preliminary matter, we consider whether the January 15 Order infringed upon the Media . Coalition's First Amendment right of access, so as to require application of the balancing tests set forth in *Press–Enterprise I* and *II,* in light of the district court's provision for the release of the transcripts of the *voir dire* examinations. In this regard, the government argues that the January 15 Order did not "entirely or even significantly impair[ ]" the public's first amendment right of access but "merely deprive[d] Appellants of 'the contemporaneity and the "color and texture" of the *voir dire* proceedings.' " But one cannot transcribe an anguished look or a nervous tic. The ability to see and to hear a proceeding as is unfolds is a vital component of the First Amendment right of access—not, as the government describes, an incremental benefit. As the Third Circuit explained in *United States v. Antar,* 38 F.3d 1348 (3d Cir.1994):

> [D]ocumentary access is not a substitute for concurrent access, and vice versa. . . . [W]here a right of access exists, a court may not deny access to a live proceeding solely on the grounds that a transcript may later be made available. Such a transcript would not fully implement the right of access because some information, concerning demeanor, nonverbal responses, and the like, is neces-

sarily lost in the translation of a live proceeding to a cold transcript.

*Id.* at 1360 n. 13; *see also Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1072 (3d Cir.1984) ("[T]he availability of a trial transcript is no substitute for a public presence at the trial itself. As any experienced appellate judge can attest, the cold record is a very imperfect reproduction of events that transpire in the courtroom." (internal quotation marks omitted)); *Soc'y of Prof'l Journalists v. United States Sec'y of Labor,* 616 F.Supp. 569, 578 (D.Utah 1985) ("[T]he full flavor of [a] hearing cannot be sensed from the sterile sheets of a transcript. Emotions, gestures, facial expressions, and pregnant pauses do not appear on the reported transcript. Much of what makes good news is lost in the difference between a one-dimensional transcript and an opportunity to see and hear testimony as it unfolds." (citation omitted)). Indeed, during the *voir dire* in this case, counsel for one of the defendants challenged a potential juror for cause, stating, "You can tell from the look on his face and the tension when he was answering those questions that he is angry." On the basis of this challenge, the district court excused the potential juror.

We do not mean to suggest that providing documentary, in lieu of concurrent, access is never an appropriate result. Where, applying the constitutionally mandated balancing test, a court has found that concurrent access must be denied, the provision of a transcript may well be the best available substitute. *See Antar,* 38 F.3d at 1360 n. 13 ("Of course, where a court follows the [proper] procedure ... and finds that closure is necessary and effective to preserve an overriding interest, so that the right of access may therefore be temporarily limited, later release of a transcript may be the next best means of implementing the right of access."). The provision of a transcript, however, does not somehow allow for a more lenient balancing test. As the Third Circuit noted in *United States v. Simone,* 14 F.3d 833 (3d Cir.1994):

> Because we have found that the district court's findings in this case were insufficient to support closure, we cannot conclude that the release of the transcript afforded adequate access in this case. To do so would relax the standard for closure and would undermine one of the essential aspects of access by permitting public scrutiny of the proceedings only at this later time ....

*Id.* at 842. The government's contention that the limited denial of access imposed by the January 15 Order "is not a sufficiently 'substantial constitutional consideration' to outweigh the considerable interests of the defendants and the public in a fair trial," thus begs the question of whether there was a sufficient factual basis for denying access at all. Accordingly, we turn to that question.

### B. Adequacy of Factual Findings

■ Under the test established in *Press–Enterprise I,* to overcome the presumption of openness, the district court was required, *inter alia,* to make detailed findings demonstrating that closure was essential to preserve "higher values." 464 U.S. at 510, 104 S.Ct. 819. Because the competing interest asserted in this case was the Sixth Amendment right of the defendants to a fair trial, the district court more specifically had to find, pursuant to *Press–Enterprise II,* that there was a "substantial probability" that the defendants' right to an impartial jury would be prejudiced by publicity that closure would prevent. 478 U.S. at 14, 106 S.Ct. 2735.

Here, the district court's findings with respect to closure (as recounted above) were essentially as follows: that members of the media had shown an intense interest

in the Stewart prosecution, an interest beyond that exhibited in other high-profile cases and unprecedented in the district court's experience; that, in light of the extensive media coverage, which included editorial pronouncements of opinion about the underlying merits of the charges, many prospective jurors were likely to have prejudged the defendants; that it was essential for venire members to disclose any such preconceptions in order for the defendants to receive a fair trial; that there was a substantial risk that members of the media, if present at *voir dire* sessions, would disclose the names of prospective jurors in recounting the substance of the examinations; and that this possibility would inhibit venire members from giving full and frank answers to the questions posed. For the reasons that follow, we conclude that these findings were not sufficient to establish a substantial probability that open *voir dire* proceedings would have prejudiced the defendants' right to an impartial jury.

First, the district court did not find, and there is nothing in the record to suggest, that members of the media at any point violated an order of the district court or otherwise conducted themselves improperly in covering the case. While the district court stated that "portions of the jury questionnaire [that had been] provided to prospective jurors on January 6, 2004, were disclosed to the public in violation of [the] Court's directives," *United States v. Stewart*, No. 03 Cr. 717, slip op. at 1, 2004 WL 65159, 2004 U.S. Dist. LEXIS 426 (S.D.N.Y. Jan. 15, 2004), there is no indication that this infraction was committed by a media representative. On the contrary, the information was posted on the website www.gawker.com by a person purporting to be a prospective juror. The district court thus did not demonstrate a substantial probability that, absent closure, members of the media would have either disrupted the proceedings or disclosed information that the court had prohibited them from revealing.

Second, with respect to the district court's finding that many venirepersons were likely to have prejudged Stewart, we note that prospective jurors are likely to have preconceptions about the defendants in almost every criminal case that attracts media attention. If this fact alone were sufficient to warrant closure, then courts could routinely deny the media access to those cases of most interest to the public, and the exception to openness would swallow the rule.

Third, we discern no basis for the district court's conclusion that prospective jurors would have been unwilling to express for publication any preconceptions that they might have had about the defendants. As a preliminary observation, it is worth noting that the defendants, Martha Stewart and Peter Baconovic, were both seated in the robing room. We find it difficult to conceive of a potential juror who would be willing to reveal a bias against the defendants in their presence but not in the presence of reporters.

More importantly, the district court did not point to any controversial issue to be probed in *voir dire* that might have impaired the candor of prospective jurors. In *King*, the *voir dire* examinations explored the racial views of potential jurors; given the prevailing national consensus concerning the evils of racism, the district judge recognized that potential jurors were unlikely to admit openly to harboring racist views. No similarly sensitive or contentious lines of questioning were here identified by the district court. It is, for example, difficult to imagine a person losing his or her job because he or she acknowledged admiration for or animosity toward Stewart. Nor would it have re-

quired the theologian's heroic virtue for a person to express for publication a distrust in corporate leadership or a distaste for the niceties of home decorating. At oral argument, the government asserted for the first time that the *voir dire* proceedings examined whether prospective jurors had sexist attitudes that would impair their impartiality, and that these attitudes are of the sort that prospective jurors might have been unwilling to express publicly out of fear of societal (or marital) reprisal. We do not have to decide whether the importance of uncovering sexism coupled with the high-profile nature of the proceedings would have been enough to justify closure because, as the government conceded at oral argument, the district court did not find that sexism was an issue in this case. Under the standards set forth in *Press–Enterprise I* and *II,* the district court was required to state the reasons for closure at the time the January 15 Order was entered; the government's after-the-fact rationalization is therefore insufficient . to overcome the presumption of openness. *See United States v. Antar,* 38 F.3d 1348, 1361 (3d Cir.1994) ("Under the procedure established in *Press–Enterprise I* and the subsequent right of access cases, closure may not be retroactively validated."). In any event, we have independently reviewed the *voir dire* transcripts and ascertained that the questions asked did not call upon potential jurors to discuss gender bias or any other socially polarizing issues. Thus, there is nothing in either the district court's findings or in the record to suggest that the presence of reporters at *voir dire* proceedings would have especially chilled juror candor. This case is, therefore, distinguishable from *King.*

In sum, we do not see anything in the district court's findings, other than perhaps the degree of media coverage, that differentiates this case from any other high-profile prosecution. The mere fact that the suit has been the subject of intense media coverage is not, however, sufficient to justify closure. To hold otherwise would render the First Amendment right of access meaningless; the very demand for openness would paradoxically defeat its availability. We take very seriously the fair trial rights of defendants, and, as demonstrated in *King,* district courts are empowered to close proceedings in appropriate circumstances to safeguard those rights. But, in general, openness acts to protect, rather than to threaten, the right to a fair trial. Where, as here, the *voir dire* proceedings do not explore particularly sensitive or controversial issues, knowledge that reporters are present probably discourages fabrication and ensures honesty on the part of venirepersons. *See Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 609 n. 26, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) ("*[O]penness* in court proceedings may *improve* the quality of testimony." (internal quotation marks omitted)). Indeed, we note that it was the government, and not the defendants, who first requested closure (a request in which the defendants subsequently acquiesced), and it is the government, not the defendants, arguing for closure on appeal. If openness would truly have jeopardized the fair trial rights of the defendants in this case, we imagine that the defendants, represented by experienced counsel, would have initiated the request for closure. Weighing the various interests at play, we find that the balance tilts heavily in favor of openness.

Our sister circuits have likewise declined to uphold orders closing *voir dire* proceedings in high-profile cases on the basis of conclusory district court findings that, absent closure, the publicity resulting from media coverage would undermine the de-

fendants' fair trial guarantee.[4] In *United States v. Peters*, 754 F.2d 753 (7th Cir. 1985), which involved an "extensively publicized" prosecution, the district court had barred the press from attending the *voir dire* examinations of prospective jurors in order to protect the "integrity of the process" after an article had appeared in the newspaper quoting the responses of three dismissed jurors to inquiries about pretrial publicity. *Id.* at 755, 761. Because, in the Seventh Circuit's view, the district court had "fail[ed] to make specific findings regarding the 'threat' to an impartial jury posed by media coverage," *id.* at 761, the Seventh Circuit vacated the order of closure. Similarly, in *In re Memphis Publishing Co.*, 887 F.2d 646 (6th Cir.1989), the district court had closed *voir dire*, finding that closure was necessary to protect the defendant's fair trial right given the notoriety of the defendant and the publicity surrounding his prosecution. *Id.* at 647–48. The Sixth Circuit reversed the order of closure, noting that "the naked assertion by the district court ... that [the] defendant's Sixth Amendment right to a fair trial 'might well be undermined,' without any specific finding of fact to support that conclusion, was insufficient to justify closure ...." *Id.* at 648.

Further, in the related context of a posttrial hearing into juror misconduct, the Third Circuit in *United States v. Simone*, 14 F.3d 833 (3d Cir.1994), reversed an order of the district court denying members of the press access to the proceedings. Concluding that the district court's order was intended to promote juror can-

dor and thereby protect the defendant's Sixth Amendment right to a fair trial, the Third Circuit stated:

> Furthermore, we do not believe that a generic concern about the veracity of testimony constitutes sufficient grounds on which to base closure.... [I]n a case such as this the trial court needs to provide specific reasons in support of a conclusion that any effects that the presence of the press and public would have on candor are sufficiently greater than in the run of cases. Such reasoning is distinctly absent from this case.

*Id.* at 841. Conversely, the cases in which orders closing *voir dire* proceedings have been upheld all implicate concerns not present here. *In re South Carolina Press Association*, 946 F.2d 1037 (4th Cir.1991), in which the court permitted closure of the *voir dire*, concerned a high-profile prosecution of legislators on charges of vote buying, bribery, and illicit drug use, as well as defense allegations that a disproportionately large number of African–American legislators had been targeted for prosecution. *Id.* at 1041. The district court had noted that, at *voir dire*, prospective jurors were going to be asked to discuss any racial biases that they might have as well as the criminal records of their family members. *Id.* at 1042. Additionally, the district court had remarked, "[a]fter viewing the statements of these potential jurors, there is no doubt in the mind of the court that their responses would not have been as candid had they believed that the press would report the contents of the proceedings." *Id.* This case thus involved

---

4. Even before the Supreme Court articulated the stringent standard necessary to overcome the presumption of openness in *Press–Enterprise I*, the Courts of Appeals did not look favorably on orders closing *voir dire* examinations. *See United States v. Brooklier*, 685 F.2d 1162 (9th Cir.1982) (finding that the district court's reasoning that closure of *voir dire* would promote the quality and credibility of testimony was speculative and therefore insufficient to justify closure); *In re Pulitzer Publ'g Co.*, 635 F.2d 676 (8th Cir.1980) (directing the opening of *voir dire* proceedings where the district court had failed to articulate findings in support of closure).

even more emotionally charged issues than those encountered in *King*.

In re *Greensboro News Co.*, 727 F.2d 1320 (4th Cir.1984), the only other circuit court decision affirming a closure of *voir dire* proceedings, also addressed an unusual factual scenario: a high-profile prosecution of Nazis and Klansmen for killing Communists. *Id.* at 1321. Elaborating upon the justification for closure, the Fourth Circuit observed:

> This case involves various organizations that occasionally evoke strong opinions in people. It may be that some people believe that these organizations are prone to violence. If some potential jurors believed these propositions they might be reluctant to express any strong opinions about these organizations, knowing that their responses would be reported by the media.

*Id.* at 1325. Thus, in contrast to this case, *Greensboro* involved socially sensitive issues of the sort present in *King*, as well as concerns that jurors might fear for their safety. In any event, *Greensboro* is of limited persuasive force because the Fourth Circuit's initial decision was handed down before *Press–Enterprise I*, and its supplemental opinion, written after *Press–Enterprise I*, did little to incorporate that decision's reasoning. *See id.* at 1326–29; *see also United States v. Koubriti*, 252 F.Supp.2d 424 (E.D.Mich.2003) (closing *voir dire* in a case involving allegations of terrorism).

### C. Narrow Tailoring

 Finally, we address the second prong of the balancing test set forth in *Press–Enterprise I* and *II*, that is, that closure orders be no broader than necessary to protect the countervailing interest advanced. Assuming *arguendo* that the district court's factual findings had been sufficient to demonstrate that there was "a substantial probability" that Stewart's and Baconvic's "right to a fair trial [would] be prejudiced by publicity that closure would prevent," the district court did not, in our view, adopt a narrowly-tailored method of protecting the defendants' fair trial rights. *Press–Enterprise II*, 478 U.S. at 14, 106 S.Ct. 2735. We stress at the outset, that, as we recognized in *King*, different circumstances call for different cures. We therefore set forth no prescriptions to be applied formulaically in future closure cases. Concerned as we are only with the case before us, we merely observe that, in this case, there were at least two available alternatives to complete closure that would have effectively addressed the district court's stated concern about the candor of prospective jurors.

First, we do not see why simply concealing the identities of the prospective jurors would not have been sufficient to ensure juror candor. Under the January 15 Order, members of the media can access transcripts of the *voir dire* examinations, redacted only to conceal the names of prospective and chosen jurors. Venire members therefore could not speak openly and frankly free of any fear that their answers would be published, but only free of fear that their names would be published alongside their answers. The district court suggested that referring to members of the venire panel by number in place of name would not have been an effective alternative to contemporaneous closure for two reasons: If members of the media had attended the *voir dire* proceedings, (1) they might somehow have discovered the names of the prospective jurors—defeating actual anonymity, and (2) potential jurors would have feared that their names would be discovered—undermining perceived anonymity. We respectfully disagree with both conclusions. Other courts have been able to conceal juror identity, without closing *voir dire* proceedings to the media, and

there is no indication in the record of media misconduct that might differentiate this case from others. At oral argument, the government suggested that the method used by the district court was more effective in encouraging disclosure than the alternative we note because prospective jurors examined in the robing room did not know that a transcript of the proceedings would be made available to the media, whereas if reporters had actually attended *voir dire*, venire members would have been aware of their presence and thus less willing to speak candidly. With respect to this argument, we are, as an initial matter, not entirely convinced that prospective jurors would have been able to distinguish a few pool reporters in attendance from the jury consultants and lawyers also present in the robing room. We cannot, moreover, accept the government's suggestion that the value of the procedure employed lay in its ability to mislead potential jurors, and we reject any inference that the district court would have intended to mislead venire members. To the extent that potential jurors were misled, this was an unfortunate consequence, not an added benefit, of the method used.

Second, even assuming that candor concerns were, as the district court found, implicated by certain *voir dire* lines of questioning, we fail to see why the media had to be barred from the entirety of the *voir dire* examinations. No benefit inured from denying the media the right to be present when jurors answered routine background questions, put forth hardship requests, or recounted other trivial details. In fact, the government voiced no objection before the district court to allowing the media to attend these limited portions of the *voir dire* examinations. In *King*, we did not require, because the appellants did not request, a split proceeding of this nature, but we did not say that such an approach need never be utilized. Here, partial closure was an available and an effective means of ensuring the candor of prospective jurors.

We therefore do not think that, to the extent that there was a constitutionally recognized basis for closure, the district court chose the most narrowly tailored course available. But in reaching this conclusion, we take no position on what alternative procedure the district court should have used and by no means suggest that the methods we advance were the only two alternatives available to the district court.[5]

## CONCLUSION

No right is more sacred in our constitutional firmament than that of the accused to a fair trial. Our national experience instructs us that except in rare circumstances openness preserves, indeed, is es-

---

5. Had the district court, instead, wished to protect the privacy interests of the prospective jurors, the proper procedure would have been for the district court to advise the array of prospective jurors that those individuals "believing public questioning [would] prove damaging because of embarrassment" could request to answer those questions *in camera*. See *Press–Enterprise I*, 464 U.S. at 512, 104 S.Ct. 819. Under *Press–Enterprise I*, only if a prospective juror put forth such an affirmative request might closure be warranted. *Id.* In *King*, we explained that where, as here, a district court is seeking to protect the defendants' right to a fair trial, rather than the privacy interests of the venire members, this procedure need not be followed: "It is one thing to oblige jurors to state in public that they prefer a closed door session to identify sensitive matters .... It is quite a different matter to expect them to acknowledge in public that their own candor will be inhibited by questioning in public." *King*, 140 F.3d at 82. Certainly, if in the course of questioning, a prospective juror had stated that his or her candor would be impaired by public questioning, the district court could properly have taken this concern into consideration in deciding whether to hear that individual *in camera*.

sential to, the realization of that right and to public confidence in the administration of justice. The burden is heavy on those who seek to restrict access to the media, a vital means to open justice. Here, the government has failed to overcome the presumption of openness. The mere fact of intense media coverage of a celebrity defendant, without further compelling justification, is simply not enough to justify closure.

For the forgoing reasons, we find that the district court did not set forth a sufficient factual basis for closure of the *voir dire* examinations and that, in any event, the district court's closure order was not narrowly tailored to protect the defendants' fair trial right. We therefore grant the appellants the only relief that they have requested, by vacating the portion of the January 15 Order that barred the media from attending the *voir dire* proceedings held in the district judge's robing room.